## UNITED STATES v. MATSINGER.
### No. 14913.

United States District Court
E. D. Pennsylvania.
Aug. 14, 1950.

Gerald A. Gleeson, U. S. Atty., Thomas J. Curtin, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

John M. Smith, Jr., Philadelphia, Pa., for defendant.

GRIM, District Judge.

The defendant has been convicted under an Act of Congress, 12 U.S.C.A. 592 [1948 Revised Criminal Code, 18 U.S.C.A. § 656], which is: "Any officer * * * of any insured bank * * * who * * * willfully misapplies any of the moneys, funds, or credits of such * * * bank * · * * with intent in any case to injure or defraud such * * * bank * * * shall be guilty of a misdemeanor * * *"

Since the verdict of the jury was against the defendant, the facts may be stated as follows: Starting in September, 1946, and continuing to February 26, 1947, Samuel S. Backer [1] and Chester Opp obtained money from the Lafayette Trust Company [2] in Easton, Pennsylvania, by check kiting which was practiced as follows: Opp had a checking account in the Bethlehem National Bank in Bethlehem, Pennsylvania, which is about 12 miles from Easton. Backer had a checking account in the Lafayette Trust Company. Almost daily during the check kiting period, Opp gave checks in large denominations to Backer payable to Backer drawn on Opp's account in the Bethlehem National Bank, which checks were either cashed at the Lafayette Trust Company by Backer or deposited by him in his account therein. In almost every case the funds in Opp's account in the Bethlehem National Bank were insufficient to pay the checks which Opp gave to Back-

---

1. Backer has pleaded nolo contendere on a charge of being an aider and abetter.

2. The Lafayette Trust Company is a bank which is insured by the Federal Deposit Insurance Corp.

er, but it took three or four days for the checks to clear and to go to the Bethlehem National Bank, which gave Backer and Opp time to raise money to deposit in Opp's account in the Bethlehem National Bank to make the checks good before they arrived at the Bethlehem National Bank. In most cases the money, which was deposited in the Bethlehem National Bank to make the checks good, was raised by cashing other checks at the Lafayette Trust Company, drawn by Opp on his account at the Bethlehem National Bank and payable to Backer. These checks in turn were made good before they cleared by cashing additional checks at the Lafayette Trust Company. Since Bethlehem is only 12 miles from Easton, it took very little time to take the cash from Easton to Bethlehem to make good the Bethlehem checks before they arrived in Bethlehem. The check kiting was made possible by the fact that it took three or four days for the checks to clear from Easton to Bethlehem, while it took only a few minutes to carry the currency obtained from newly cashed checks from Easton to Bethlehem. By a continuous manipulation of checks in this manner all the Opp checks were made good until February 26, 1947, when the kiting got out of control and Opp's checks, then in course of clearance, were returned to the Lafayette Trust Company because of insufficient funds in the Opp account to pay them. The loss to the Lafayette Trust Company in the transactions amounted to some $50,000. It, however, has been reimbursed in full by Backer and by the bank's bonding company. The face value of the checks, which were used in the transactions, totalled approximately $1,400,000.

The defendant was the executive vice-president of the Lafayette Trust Company. The president was only a part time employee and spent little time in the bank. As executive vice-president, the defendant had the authority to, and did, determine what checks should be cashed by the bank. In no case did the defendant cash any of the checks himself, but he permitted the checks to be cashed by bank employees who served under him, although on a number of occasions [3] during the check kiting period he was informed [4] of the check kiting, and he knew when the checks were cashed that there were insufficient funds in the Opp account in the Bethlehem National Bank to pay them.[5] There is no evidence that the defendant benefited from the check kiting, nor is there any evidence that he was promised any benefit. He was given Christmas gifts by Backer, but so were the other bank employees. Backer was an old and well regarded customer of the Lafayette Trust Company and a substantial resident of the community.

The defendant has moved for a judgment of acquittal and for a new trial.

▮ Under these facts, is the defendant guilty of a wilful misapplication of bank funds with an intent to injure or defraud

---

3. He was called on the telephone by the president of the Bethlehem National Bank and told that the Bethlehem records indicated that check kiting was going on. From time to time thereafter employees of the Lafayette Trust Company told him that check kiting was being practiced by Backer.

4. The counts in the indictment covered the period from September, 1946, through February 26, 1947. He was acquitted on the counts covering the period from September through December 15, 1946, and convicted on the counts covering the period from December 15, 1946, through February 26, 1947. Apparently the jury came to the conclusion that the defendant did not know of the check kiting until December 15, 1946.

5. The information, which was given to the defendant, was not precisely that there were insufficient funds in the Opp account in the Bethlehem National Bank to pay the checks. The information was that check kiting was being practiced, and from this he knew that there were insufficient funds to pay the Opp checks, because as a former bank examiner and a former teacher of banking he knew that the essence of check kiting is an improper obtaining of bank funds by the cashing of checks when there is insufficient money to pay the checks, and then making the checks good in some manner before they clear to the bank on which they have been drawn.

the bank? In my opinion he is. Undoubtedly, it is a common practice for banks to cash checks for well known and well regarded customers, even though the checks are drawn on other banks and the cashing bank does not know whether or not there are sufficient funds to pay the checks when they clear. There is nothing criminal about this. But when, as has happened in the present case, a bank employee permits checks to be cashed, in large quantities and in large denominations, when he knows that the checks are not good as they are presented to his bank, and that the checks are being cashed to obtain money improperly from his bank, then an entirely different situation is presented. In this situation the employee is guilty of a wilful misapplication of bank funds with an intent to injure or defraud the bank.

U. S. v. Mulloney, 1 Cir., 79 F.2d 566, certiorari denied 296 U.S. 658, 56 S.Ct. 383, 80 L.Ed. 468.

In his charge the trial judge frequently used the word "scheme" in describing the plans of Backer and Opp in their check kiting transactions. Defendant contends that this was error for which a new trial should be granted because there is no charge of conspiracy in the case. This is not error, however, because the word "scheme" accurately describes what Backer and Opp had in their minds. It is because the defendant permitted the "scheme" to be carried out in his bank that he is guilty of a misapplication of bank funds with intent to injure or defraud the bank. The defendant is not guilty of a conspiracy to misapply funds. He is guilty of an actual misapplication, because he permitted such an obvious improper misuse of bank funds. Certainly, it was not an error to describe the plan of Backer and Opp as a "scheme". The trial judge was careful to warn the jury in his charge that he meant no inference of guilt by the use of the word "scheme".

The defendant contends also that error was committed when the trial judge refused to withdraw from the jury's consideration counts relating to more than one check. In several of the counts of the indictment, two checks have been included to show the misapplication on the day of the date of the checks. In each of these cases, the two checks are dated on the same day and they were cashed at the same time. Why there were two checks instead of one check on these days has not been explained, but it is obvious that they were part of one transaction and constituted one misapplication. Under these circumstances, it was not necessary to draw separate counts for each check and no error was committed in refusing to withdraw these counts from the jury's consideration.

The motion for judgment of acquittal is refused and the motion for a new trial is refused.