## UNITED STATES v. MATSINGER.

### No. 10354.

United States Court of Appeals
Third Circuit.

Argued May 8, 1951.

Decided Sept. 20, 1951.

John M. Smith, Jr., Philadelphia, Pa., for appellant.

Thomas J. Curtin, Philadelphia, Pa. (Gerald A. Gleeson, U. S. Atty., Philadelphia, Pa., on the brief), for appellee.

Before BIGGS, Chief Judge, and MARIS and STALEY, Circuit Judges.

BIGGS, Chief Judge.

The appellant, Matsinger, executive vice-president of the Lafayette Trust Company of Easton, Pennsylvania, an insured bank within the meaning of Section 264(c), Title 12, U.S.C. (1940 ed.), was indicted, tried and convicted for violation of Section 592, Title 12, U.S.C. (1940 ed.) [1] for misapplication of funds of the Bank. The court below in its opinion at 92 F.Supp. 516, et seq., has stated most of the facts which are necessary to understand the case. We shall merely recapitulate the contents of that opinion here and refer to a few additional circumstances which we deem pertinent. We shall, of course, take the facts and the inferences to be drawn therefrom most strongly against Matsinger and in support of the jury's verdict.

Backer and Opp kited 509 checks over a period from September 1946 to February 28, 1947, the kite being based on the short distance between Easton and Bethlehem, Pennsylvania, about twelve miles. Opp gave Backer checks, signed by Opp in blank and drawn on his, Opp's, account at the Bethlehem National Bank at Bethlehem. Backer cashed or deposited these

1. Now embodied in Sections 334, 656 and 1005 of Title 18 U.S.C.

checks at the Lafayette Bank delivering them to two tellers at that Bank, who in turn proceeded to give Backer cash or credit therefor. Backer would then take cash or checks drawn to Opp's order to the Bethlehem Bank and make deposits to Opp's account there. Three or four days would be required for the checks drawn on Opp's account at the Bethlehem Bank and deposited at the Lafayette Bank to clear through the Federal Reserve Bank at Philadelphia, whereas it would take only a short time to drive the twelve miles from Easton to Bethlehem to make deposits, sometimes of the very money drawn from the Lafayette Bank, to Opp's account in the Bethlehem Bank.

It was not shown by the evidence that Matsinger received any profit from the kiting. He testified that about a week before Christmas he became aware that the Lafayette Bank was paying out money to Backer on Opp's uncollected checks; that he immediately called Backer and told him that he must stop drawing checks against uncollected items, and that after Christmas 1946 he believed that Backer had ceased the practices but that toward the middle of February, 1947 he discovered that this was not true. Matsinger testified that he called Backer again and informed him that the objectionable practice would have to terminate but that he, Backer, might cash a few small checks to bring the transactions to a close as conveniently as possible. Matsinger stated that from February 13 until February 21, 1947, "I would allow him [Backer] to cash a check in a smaller amount each day." This, said Matsinger, effected a reduction in the amount of checks being cashed by Backer at the Lafayette Bank to about $5,000 a day. Matsinger went on to say, "* * * I was telling him that he could cash a check in a smaller amount each day, and telling the tellers to cash a check in the smaller amount each day, still feeling that my collateral or the collateral the bank held put me in a perfectly safe position if any of these checks were returned unpaid."

Some very large checks were cashed by Backer within the period indicated, but Matsinger insisted that he did not authorize these payments; that the two tellers, hereinbefore referred to, would cash checks larger than he authorized, they, like he, being deceived by Backer. The deceit, according to Matsinger, consisted of Backer bringing him a check or checks. He, Matsinger, would authorize the tellers to pay them. Backer would then take a larger check or larger checks to the tellers and inform them that Matsinger had authorized the payment and would receive cash or credit therefor.

 Beckel, President of the Bethlehem National Bank, telephoned Matsinger in December 1946 and informed him that kiting transactions were going on between the two banks. In February 1947 Beckel again telephoned Matsinger and repeated his warning. At various times during the period involved employees of the Lafayette Bank informed Matsinger of the Backer-Opp transactions. Matsinger is a former bank examiner and a man experienced in banking practices. Matsinger went so far as to admit in the language last quoted that he had in mind the possibility of some of Opp's checks being returned unpaid. The tellers, to whom we have referred, testified in substance that they were acting pursuant to Matsinger's orders in cashing large checks, at least from February 13, 1947 on. Matsinger testified that he was deceived by Backer but the jury was at liberty to reject his testimony in this regard. The tellers testified that they believed that check kiting between Backer and Opp was going on and informed Matsinger of this. Bearing in mind that a case may not be submitted to a jury when the actions of the accused are as consistent with innocence as with guilt and considering also that Matsinger is charged not with improvident or negligent banking practices but with intent to defraud the institution which he served, we conclude nonetheless that the case was properly one for submission to the jury. The question was whether or not Matsinger was guilty of wilful misapplication of funds

with intent to defraud the Lafayette Bank.[2]

We find it necessary, however, to reverse the judgment of conviction for the reasons set out hereinafter. A reading of the court's charge to the jury shows that the learned trial judge did not properly point out to the jury the meaning of the phrases of the statute respecting *wilful misapplication* of funds with *intent to defraud* the bank.[3] A reading of that portion of the charge quoted below[4] demonstrates the accuracy of our statement.

In United States v. Britton, 107 U.S. 655, 666, 2 S.Ct. 512, 522, 27 L.Ed. 520, the phrase, "wilful misapplication" in the statute was defined to be "a misapplication for the use, benefit, or gain of the party charged, or of some company or person other than the [banking] association", and to constitute the offense it was stated that there must be a conversion to the use of the offender, or of someone else, of the money or credit of the bank by the accused. As was pointed out in Evans v. United States, 153 U.S. 584, 588, 14 S.Ct. 934, 38 L.Ed. 830, an indictment which merely charges a maladministration of the affairs of the bank rather than a criminal misapplication it not sufficient. There must be averments showing how the application was made and that it was an unlawful one. The proof, of course, must support the allegations. The Supreme Court in the Evans case pointed out that the Britton case had come before it a second time, 108 U.S. 192, 199, 2 S.Ct. 525, 27 L.Ed. 703,

and that it was held that the declaration of a dividend by the bank when there were no profits to pay it from, an illegal act which might render the directors personally liable in damages, was not a crime within the purview of the statute. At this point, as we understand it, there comes into play the second portion of the statute, namely, "misapplication with intent to injure or defraud the bank". If a dividend be illegally declared with the intent to defraud the bank the persons responsible for the declaration face criminal sanctions and have committed the crime defined by the statute. Cf. Morrissey v. United States, 9 Cir., 67 F.2d 267, and Mulloney v. United States, 1 Cir., 79 F.2d 566. See also Savitt v. United States, 3 Cir., 59 F.2d 541.

In the instant case the jury must find both elements to be present if Matsinger is to be convicted. The jury must find both misapplication of funds and also that Matsinger permitted or authorized the misapplication or misapplications with intent to injure or defraud the bank. The court must charge properly and fully on both elements.

Matsinger also contends that the court below committed reversible error in permitting the United States to introduce evidence that the Lafayette Bank suffered permanent and substantial losses. We cannot agree. To show misapplication of funds with intent to defraud it was necessary to show losses. The United States pitched its proof upon showing loss from

2. In view of the fact that the jury acquitted Matsinger on all the counts involving check-cashing transactions earlier than December 15, 1946, it is clear that the jury preferred to believe Matsinger's testimony as to his own guilty knowledge in part. The jury did not believe in his good faith past December 15, 1946. The nine counts of the indictment on which Matsinger was found guilty all embraced transactions following the date last stated.

3. The statute, Section 592, Title 12, U.S. C. (1940 ed.), in pertinent part provides: "Any officer * * * of any insured bank * * * who * * * willfully misapplies any of the moneys, funds, or credits of such * * * bank * * * with intent in any case to injure or de-

fraud such * * * bank * * * shall be guilty of a misdemeanor * * *."

4. The court charged in this regard as follows: The problem for you isn't to decide what Mr. Matsinger should have known, but the situation here is what Mr. Matsinger actually knew. Did he or did he not know these things? He is not being charged with negligence. If he did something improper between the bank and himself, if he didn't handle his business properly, that is something as between him and the bank, but it is not before us here as an element in this criminal case. The question is did he or did he not know that these transactions were taking place, that these checks were being cashed day by day in this check kiting, as you might call it, alleged scheme."

individual transactions resulting in a final permanent loss. It was necessary, of course, to prove in the instant case, (1) that there was more than a mere bookkeeping transfer or transfers within the bank, Johnson v. United States, 4 Cir., 95 F.2d 813, and (2) that there were actual conversions of the bank's money, United States v. Heinze, C.C., 183 F. 907. While we agree that it was not an essential or necessary part of the case of the United States to show final permanent loss,[5] nonetheless proof of such loss was permissible to show Matsinger's intent to effect wilful misapplication of funds with intent to defraud. A showing of momentary losses resulting from the cashing of each check at the Lafayette Bank by Backer could have been sufficient to sustain the counts of the indictment. The extent of the final permanent loss and the period of time over which it was sustained, however, tended to prove a prolonged and continuous course of conduct involving funds of the bank, which, under the circumstances at bar could have convinced the jury of a specific intent by misapplication of funds to defraud the bank.

 We agree, however, with Matsinger that he was entitled to prove by way of defense that the bank "charged interest upon the amount represented by the checks on which payment had been refused", and that Backer had paid interest on this amount. This evidence, if submitted to the jury, would have tended to prove that the Lafayette Bank had effected a loan to Backer or at least did not regard the shortages as losses. The fact that a bank might charge interest on losses, of course, is not conclusive as to its attitude respecting a misapplication of its funds. Banks charge interest on as innocent items as overdrafts and also on occasion on losses which result from illegal or criminal acts of officers or employees. The charging of interest to Backer in the instant case might or might not negative *mens rea* as to Matsinger. The question presented is primarily one for determination by the jury and it should be submitted by the trial court with appropriate instructions. The court below committed error in failing to do so.

The appellant contends that the court below committed reversible error in refusing to withdraw from the jury's consideration counts based on more than one check kiting transaction. Only three of the counts upon which Matsinger was found guilty fall within this category, viz., counts 13, 14 and 15. The contention made by the appellant is quite without merit for the evidence demonstrates where two check kiting transactions were included in a single count the checks were submitted for payment at substantially the same time and properly may be considered as part of the same fraud. No confusion resulted from the combinations.

The judgment of conviction will be reversed and the cause remanded with the direction to grant a new trial.

---

5. See Rakes v. United States, 4 Cir., 169 F.2d 739, 743, and the authorities contained in note 2 cited to the text.