UNITED STATES of America

v.

Murray H. MICHAEL, Defendant.

Crim. No. 77–455.

United States District Court,
D. New Jersey.

Aug. 17, 1978.

Robert J. Del Tufo, U. S. Atty., by Charles A. Matison, Sp. Atty., Newark, N. J., for Government.

Morton Stavis, Newark, N. J., Joseph Forer, Washington, D. C., for defendant.

## OPINION

GERRY, District Judge.

Defendant Murray H. Michael has made a timely motion to dismiss certain counts of a superseding indictment which alleges that Michael conspired with, and aided and abet-

ted, James Neveras, vice president of the Trust Company of New Jersey, in willfully misapplying the monies, funds and credits of the bank in violation of 18 U.S.C. §§ 371, 656 & 2. The defendant also challenges three counts which charge that he violated the Travel Act, 18 U.S.C. § 1952, by traveling from Florida to New Jersey on specified dates with intent to bribe Neveras in violation of N.J.S.A. § 2A:91–1 and 18 U.S.C. § 215 and thereafter paying a $10,000 fee to Neveras for the purpose of procuring each of three loans from the bank.

The various counts are attacked for failing to state an offense against the United States. The challenges to the willful misapplication conspiracy and Travel Act counts raise rather difficult issues regarding the scope of these criminal statutes, to which we now turn.

### I. *Substantive Misapplication—Counts 6, 7, 17–25*

Defendant Murray H. Michael is charged in Counts 2 through 25 of the superseding indictment with aiding and abetting a named officer of a federally insured bank in willfully misapplying bank monies, funds and credits with intent to injure and defraud the bank through unsecured loans to defendant and to dummy corporations in excess of $800,000, in violation of 18 U.S.C. §§ 656 [1] & 2.[2] Under section 656 any officer of a federally insured bank who "embezzles, abstracts, purloins or willfully misap-

---

1. 18 U.S.C. § 656—covering willful misapplication and other crimes—provides as follows:

    Whoever, being an officer, director, agent or employee of, or connected in any capacity with any Federal Reserve bank, member bank, national bank or insured bank, or a receiver of a national bank, or any agent or employee of the receiver, or a Federal Reserve Agent, or an agent or employee of a Federal Reserve Agent or of the Board of Governors of the Federal Reserve System, embezzles, abstracts, purloins or willfully misapplies any of the moneys, funds or credits of such bank or any moneys, funds, assets or securities intrusted to the custody or care of such bank, or to the custody or care of any such agent, officer, director, employee or receiver, shall be fined not more than $5,000 or imprisoned not more than five years, or both; but if the amount embezzled, abstracted, purloined or misapplied does not exceed $100. he

shall be fined not more than $1,000 or imprisoned not more than one year, or both.

As used in this section, the term "national bank" is synonymous with "national banking association"; "member bank" means and includes any national bank, state bank, or bank and trust company which has become a member of one of the Federal Reserve banks; and "insured bank" includes any bank, banking association, trust company, savings bank, or other banking institution, the deposits of which are insured by the Federal Deposit Insurance Corporation.

2. 18 U.S.C. § 2—the aiding and abetting statute—provides in subsection (a):

    Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

plies any of the moneys, funds or credits of such bank" is guilty of a crime.

Counts 6, 7, and 17–25 are challenged because the defendant argues that these counts charge that the proceeds of the loans alleged to be misapplications were used to pay principal and interest of prior fraudulent loans from the bank, and thus the allegedly misapplied loan proceeds never left the bank but were, instead, credited toward a pre-existing indebtedness to the bank.[3] (The remaining thirteen misapplication counts are not challenged.) The defendant argues that these counts merely allege in substance that the bank officer approved a loan that he knew to be worthless in order to apply the proceeds to pre-existing worthless loans, and that this cannot be a "misapplication" because there has been no conversion of bank funds.

The sole issue before us is whether it is a criminal misapplication under section 656 to knowingly grant a loan to a sham or dummy corporation having no capability of repaying the loan where the proceeds are used to pay principal and interest on a prior fraudulent loan in an effort to conceal from the bank the existence and fraudulent nature of the prior loan.

In deciding this issue, the court is scarcely writing on a clean slate. The predecessor statutes of section 656 regarding willful misapplication of bank funds date from 1864, in Act of June 3, 1864, § 55, 13 Stat. 116. The substance of the earlier statutes was largely recodified by Congress in 1948 in the current section 656, derived from the former 12 U.S.C. § 592 (1940), *inter alia,* without relevant change. *See* 18 U.S.C.A. § 656 (1976), Reviser's Note.

The law of misapplication of bank funds was largely shaped by a series of Supreme Court decisions in the last two decades of the nineteenth century commencing with *United States v. Britton [Britton I]*, 107 U.S. 655, 2 S.Ct. 512, 27 L.Ed.2d 520 (1883), and including *Evans v. United States*, 153 U.S. 584, 14 S.Ct. 934, 38 L.Ed. 830 (1894);

---

**3.** Count 6 is typical of the challenged misapplication counts, each of which allege the unsecured loan of a substantial sum to a dummy corporation for the use and benefit of defendant Michael, to pay to the bank principal and interest on previous fraudulent loans. Attention is especially drawn to ¶ 2(f). Count 6 provides:

1. Paragraphs 1 through 8 of Count 1 of this Indictment are hereby realleged and incorporated as though set forth in full herein. [*See* note 7 *infra* for text of Count 1.]

2. On or about October 31, 1974, in the District of New Jersey and elsewhere, the defendant, MURRAY H. MICHAEL together with the unindicted co-conspirator James M. Neveras and others, did wilfully misapply and cause to be misapplied monies, funds and credits of the Trust Company of New Jersey in the amount of $50,000.00, with the intent to injure and defraud said bank, by causing the unindicted co-conspirator James M. Neveras to grant an unsecured loan in the amount of $50,000.00 from said bank to American Housekeeping, Inc., in reckless disregard of the interests of the Trust Company of New Jersey as follows:

a. By causing the unindicted co-conspirator James M. Neveras to grant the aforementioned loan to a sham or dummy company, American Housekeeping, Inc., the proceeds of which were for the benefit and use of the defendant, MURRAY H. MICHAEL; and

b. By causing the unindicted co-conspirator James M. Neveras to approve the aforementioned loan without securing adequate financial background information on the sham or dummy company sufficient to assure that the aforementioned sham or dummy company was financially capable of repaying said loan; and

c. By causing the unindicted co-conspirator, James M. Neveras, to conceal from the bank and the Board of Directors the identity of the defendant, MURRAY H. MICHAEL, as the real beneficiary of the aforementioned loan, in contravention of the established loan policies of the Trust Company of New Jersey; and

d. By causing the unindicted co-conspirator, James M. Neveras, to approve the aforementioned loan without requiring adequate collateral to secure said loan; and

e. The aforementioned sham or dummy company, as the defendant, MURRAY H. MICHAEL, well knew, was financially incapable of repaying the aforementioned loan; and

f. By causing the unindicted co-conspirator, James M. Neveras, to approve the aforementioned loan for purported business purposes when, in truth and in fact, the proceeds of which were used to pay principal and interest on the previous fraudulent loans in an effort to conceal from the bank the existence and fraudulent nature of those previous loans.

All in violation of Title 18, United States Code, Sections 656 and 2.

*Batchellor v. United States,* 156 U.S. 426, 15 S.Ct. 446, 39 L.Ed. 478 (1895); *Coffin v. United States,* [*Coffin I*], 156 U.S. 432, 15 S.Ct. 394, 39 L.Ed. 481 (1895); and *Coffin v. United States* [*Coffin II*], 162 U.S. 664, 16 S.Ct. 943, 40 L.Ed. 1109 (1896).

■ The general rule announced in *Britton I, supra,* 107 U.S. at 666, 2 S.Ct. at 522, is that "to constitute the offense of willful misapplication, there must be a conversion to [the bank officer's] own use or [to] the use of some one else of the moneys and funds of the [bank] by the party charged." The criminality of a misapplication "depends upon the question whether there was, at the time of the discount, a deliberate purpose on the part of the defendant to defraud the bank of the amount." *Evans v. United States, supra,* 153 U.S. at 592, 14 S.Ct. at 938. The Third Circuit has recognized the continuing vitality of these precepts in *United States v. Matsinger,* 191 F.2d 1014 (3d Cir. 1951) (Biggs, J.), and it has approvingly discussed at length modern cases (*e. g., United States v. Gens,* 493 F.2d 216, 221–222 (1st Cir. 1974), and *United States v. Docherty,* 468 F.2d 989, 993–994 (2d Cir. 1972)) applying *Britton I* and its progeny in the recent opinion in *United States v. Gallagher,* 576 F.2d 1028, 1044–46 (3d Cir. 1978) (Biggs, J.).

Furthermore, "intent to injure or defraud" the bank remains an essential element of the crime of willful misapplication notwithstanding the unexplained deletion of those words in the 1948 recodification. *United States v. Docherty, supra,* 468 F.2d at 994–995 (and cases cited therein); *see United States v. Schmidt,* 471 F.2d 385, 386 (3d Cir. 1972).

In *Batchellor v. United States, supra,* 156 U.S. at 431, 15 S.Ct. [446], at 448, the Supreme Court examined an indictment which alleged in relevant part that the defendant bank president fraudulently cancelled the indebtedness of one John Batchellor, known to be insolvent, by substituting other unsecured notes to the bank endorsed by himself or other insolvent third parties without ability to repay. This pretense of paying off the prior uncollectible indebtedness was held to not constitute misapplication; it "amounts only to the substitution of worthless notes for other notes equally worthless without, so far as the indictment shows, the payment of any money or other consideration whatever." *Id.*

■ The *Batchellor* principle was repeated in *Coffin II, supra,* 162 U.S. at 677, 16 S.Ct. at 948, wherein the Court held:

If the money of a bank be misapplied by paying it out on worthless paper, it is obvious that a subsequent renewal of such paper upon which nothing was actually obtained could not have misapplied the money of the bank.

The Court implied that there is no criminal misapplication if the transaction was "based upon the renewals of paper merely without in any way depleting the funds of the bank." *Id.* at 678, 16 S.Ct. at 949. In other words, a second loan procured by fraudulent means will not give rise to a criminal misapplication unless the natural tendency of the application of such funds is to injure or defraud the bank, because "the offense consists not in the use of fraudulent means, but in the discount of a note which both parties knew to be unsecured, with the intent thereby to defraud the bank." *Evans v. United States, supra,* 153 U.S. at 593, 14 S.Ct. at 938. It is the fraudulent application of such funds or credit in a manner tending to injure the bank, rather than their fraudulent procurement, which is the essence of this offense. *Id.*

A key case repeating these principles is *Johnson v. United States,* 95 F.2d 813 (4th Cir. 1938), cited by the Third Circuit in *United States v. Matsinger, supra,* 191 F.2d at 1018, for the proposition that a necessary element of criminal misapplication is "that there was more than a mere bookkeeping transfer or transfers within the bank." In *Johnson,* the defendant bank officer credited his personal checking account with the proceeds of a note of a third party (Stover) discounted by the bank, to eliminate defendant's checking overdraft. The court held that, even if Stover's note would not have been paid at maturity, there would be no misapplication under the statute absent

some conversion of the bank's funds; that is, the fraudulent crediting "is not a crime unless some portion of the fund credited is withdrawn from the possession or control of the bank or a conversion thereof in some form is made so that the bank is deprived of the benefit thereof. *Dow v. United States,* 8 Cir., 82 F. 904; *Adler v. United States,* 5 Cir., 182 F. 464; *Craig v. United States,* 9 Cir., 5 F.2d 275." 95 F.2d at 817. It was significant to the *Johnson* court that none of the money credited to the defendant's account was alleged to have been withdrawn from the bank. *Id.*

In *Matsinger, supra,* the Third Circuit required the government to allege and prove that there were actual conversions of the bank's money and, as noted, that there was more than a mere bookkeeping transfer within the bank. 191 F.2d at 1017–18. Such a conversion was held to be shown by a momentary, nonpermanent loss of the bank's custody or control of the money when the bank cashed checks from a conspirator's account in another bank which was "kited," *i. e.,* not backed by sufficient funds. in fact due to the 3–4 day delay processing of checks deposited to that account to artificially inflate the balance. These fraudulent transactions were a misapplication of bank funds because the bank was called upon to pay out money in cashing checks not backed by sufficient funds. Even though the bank's loss might be only temporary if the cashed checks were subsequently backed by sufficient funds when

presented for payment to the other bank, the fact of temporary loss of bank funds upon the cashing of the checks was held sufficient to support the misapplication charge. 191 F.2d at 1016–1018.

Beyond the bank's temporary loss of possession or control of its assets, an allegation of ultimate loss is not necessary to sustain a charge under section 656. *Id.; United States v. Gallagher, supra,* 576 F.2d at 1038, n. 5. *See also United States v. Nystrom,* 237 F.2d 218 (3d Cir. 1956) [bank's knowing payment of checks drawn against fictitious deposits amounted to requisite temporary loss to bank].

In short, an essential element of criminal misapplication is the conversion of the bank's moneys, funds or credits by either temporary withdrawal from the bank's control or possession or by temporary deprivation of the bank's use and benefit thereof amounting to more than the renewal of worthless paper or the substitution of worthless paper therefor. *Batchellor v. United States, supra; Coffin II, supra; Johnson v. United States, supra; United States v. Matsinger, supra; Cooper v. United States,* 13 F.2d 16, 19 (4th Cir. 1926); 7A *Michie on Banks and Banking* § 146a at 130, § 146b at 138–139 (1973).[4]

The government's briefs do not question or even address the above precedents. Instead, the government cites numerous authorities[5] for the proposition that no net

---

**4.** Dictum in *Rieger v. United States,* 107 F. 916 (8th Cir.), *cert. denied,* 181 U.S. 617, 21 S.Ct. 923, 45 L.Ed. 1030 (1901), that the offense may be consummated by giving fraudulent credits and the transfer of the same in the usual way by means of checks, is not to the contrary. In that case the defendant bank president's brother was promisor on the note to the bank. The defendant discounted a worthless note of one Townley, and credited the proceeds to Townley's checking account, giving Townley power to dispose of the entire proceeds of the note. Townley drew a check for part of the proceeds in favor of one Armstrong, who endorsed the check over to the defendant. The defendant used the check to pay off his brother's debt to the bank. Although no funds left the bank and the contrivance could be characterized as a series of bookkeeping transfers, there was

nonetheless a misapplication because the net result was cancellation of the indebtedness of defendant's brother to the bank without any suggestion that this original note was uncollectible. 107 F. at 927–929. Furthermore, the bank momentarily lost control of the proceeds of Townley's note for the period of time in which the funds were placed at Townley's disposal in his checking account.

**5.** *United States v. Brookshire,* 514 F.2d 786 (10th Cir. 1975); *United States v. Acree,* 466 F.2d 1114 (10th Cir. 1972), *cert. denied,* 410 U.S. 913, 93 S.Ct. 962, 35 L.Ed.2d 278 (1973); *United States v. Rickert,* 459 F.2d 352 (5th Cir. 1972); *United States v. Archambault,* 441 F.2d 281 (10th Cir. 1971); *United States v. Fortunato,* 402 F.2d 79 (2d Cir. 1968), *cert. denied,* 394 U.S. 933, 89 S.Ct. 1205, 22 L.Ed.2d 463 (1969); *Golden v. United States,* 318 F.2d 357 (1st Cir.

loss of the bank's funds need be shown and no cash or credits need actually leave the bank to support a misapplication charge. The court, as noted above, agrees with these principles, and we do not understand the defendant to argue to the contrary. The government argues that it follows that the use of proceeds on a second fraudulent loan to pay the bank its principal and interest on a prior fraudulent loan is a criminal misapplication.

With the lone exception of *United States v. Rickert,* 459 F.2d 352 (5th Cir. 1972), we are aware of no authority suggesting that such a transaction is encompassed within the doctrine of criminal misapplication. In each of the other cases there was held to be a misapplication because, at a minimum, the transfer caused the bank to (at least temporarily) relinquish control over the subject assets in a manner tending to cause financial injury to the bank, as discussed in the margin.[6]

In the *Rickert* decision the Fifth Circuit affirmed a conviction for a bank president's willful misapplication of moneys "intrusted to the custody or care of such bank" pursuant to that clause of section 656 not charged in the instant case. Although the

facts are sketchy, the defendant apparently switched money from accounts of solvent customers to cover the bad loans of other customers to prevent discovery of the bad loan losses. 459 F.2d at 354. The court pointed out that it is not necessary that cash actually leave the bank, nor that the funds be converted for the defendant's private use. *Id.* at 354–355. Quoting the Supreme Court's decision in *United States v. Northway,* 120 U.S. 327, 332, 7 S.Ct. 580, 30 L.Ed. 664 (1887), to the effect that the bank officer need not gain actual possession of the funds in order to misapply them, the Fifth Circuit noted in *Rickert*:

> The majority of banking transactions consist of bookkeeping entries rather than the actual transfer of cash. The evidence adduced at trial concerning the many debit and credit machinations of defendant relative to numerous accounts was sufficient to bring him within the ambit of *Northway's* test of willful misapplication.

459 F.2d at 355.

In the light of precedent discussed above, we fail to perceive the applicability of *Rickert* to the instant case. First, defendant Rickert's manipulations directly deprived

---

1963); *Rakes v. United States,* 169 F.2d 739 (4th Cir.), *cert. denied,* 335 U.S. 826, 69 S.Ct. 51, 93 L.Ed. 380 (1948); *Mulloney v. United States,* 79 F.2d 566 (1st Cir. 1935), *cert. denied,* 296 U.S. 658, 56 S.Ct. 383, 80 L.Ed. 468 (1936).

**6.** At least the bank's temporary loss of possession, control or use of bank assets was present in each of these cases, note 5 *supra.*

In *Mulloney, supra,* the bank officer permitted payment of $131,000 on a promissory note to a maker known to be unable to secure repayment.

In *Rakes, supra,* the Fourth Circuit held that it is a criminal misapplication to permit payments on known overdrafts from bank funds in order to support a depositor's check kiting scheme, where by the use of forged notes to balance a depositor's account, from which the depositor purchased real estate, the transactions amounted to financing the depositor's real estate transactions with funds of the bank without security.

The First Circuit later found, in *Golden, supra,* that a bank officer who employed funds on deposit in the bank to purchase stocks and real estate in his own name is criminally liable if it

is demonstrated that such moneys were in fact bank funds.

In the *Fortunato* case, *supra,* a bank officer obtained proceeds of fraudulent loans for his own use; the fact that such loans were repaid prior to indictment did not negate the fact that the bank had lost control over the funds. Similarly, in *Archambault, supra,* a bank teller converted cash bank deposits to private use before reflecting the deposit on the bank's ledger; this diversion gave rise to a conviction for embezzlement.

A bank officer in the *Acree* case purchased poor loans by paying them off, without interest, from the bank's own funds; the failure to collect interest on these loans deprived the bank of funds to which it was entitled.

A bank president who transferred his bank's funds into a non-interest bearing account at another bank as a compensating balance to cover his personal loan from that bank, converted his bank's funds to his own use to obtain a preferential loan in *Brookshire, supra,* thus depriving his bank of the interest it would have obtained had its funds been properly deposited. *See* similar result in *United States v. Mann,* 517 F.2d 259 (5th Cir. 1975).

depositors of funds entrusted to the bank by applying good deposits to the debts of others; in the instant case neither a depositor nor the bank was deprived of the use of additional assets by the fraudulent substitute loans, since the proceeds were immediately paid to the bank. Second, the reliance on *Northway* was misplaced, in this court's view, in light of the more clear expressions in later Supreme Court decisions, especially *Batchellor* and *Coffin II, supra,* that a fraudulent bookkeeping transfer between various forms of worthless paper in order to postpone the day of reckoning will not constitute a criminal misapplication.

■ It is the attempt to shield a prior fraudulent loan by granting a second one which comprises the detriment to the bank in the counts at issue. Each substitute loan with which we are here concerned allegedly tended to postpone discovery of a prior fraudulent transaction but it is not a new misapplication because the bank has lost no further degree of control over its assets. The concealment of a prior misapplication may be proof of guilty knowledge with respect to the prior crime, but concealment does not give rise to criminal liability for a second misapplication equivalent to the first unless the transaction tends to cause the bank to lose control over additional funds.

■ Congress's concern for punishing criminal concealment of banking transactions not necessarily involving misapplication is expressed in 18 U.S.C. §§ 1005 & 1006 which generally prohibit the making of a false entry in any book, report or statement with intent to defraud the bank. Similarly, 18 U.S.C. § 1014 punishes the making of a false statement for the purpose of influencing the action of a federally-insured bank on a loan application or renewal, *inter alia; see, United States v. Goberman,* 458 F.2d 226, 229 (3d Cir. 1972). These statutes are arguably applicable to the charged conduct herein. We have no doubt that sections 1005, 1006 and 1014 were enacted to proscribe criminally false or fraudulent statements which lie beyond the traditional scope of the criminal misapplication statute in section 656. We further note

that Congress has not enlarged the definition of "willfully misapplies" under section 656 and its predecessors despite nearly a century of rather restrictive judicial interpretation discussed above.

We hold that the granting of a fraudulently-procured loan, the proceeds of which were used to pay principal and interest to the bank on a previous fraudulent loan in an effort to conceal from the bank the existence and fraudulent nature of the previous loan, is not a criminal misapplication under section 656.

The government would have us limit the effect of this holding to just two counts—19 and 25—for which the entire proceeds allegedly went toward repayment of principal and interest on pre-existing fraudulent loans to the defendant, while retaining the other nine challenged counts for which the government intends to introduce proof at trial that some part of the loan proceeds was put to other uses by the defendant. For the relevant counts, the indictment nowhere recites that any part of the proceeds was used by the defendant for purposes other than loan repayment. Such an averment would, in fact, be materially inconsistent with the recitation in ¶ 2(f) of the challenged counts, *see* note 3 *supra,* that "the proceeds of [the loan] were used to pay principal and interest on the previous fraudulent loans . . . .." Thus, it seems to us that the government is, in effect, proposing to amend the indictment to state that some part of the loan proceeds were applied to the defendant's use other than repayment of prior loans.

■ The general rule is that an indictment may not be amended by the prosecutor or the court in any manner which would change the substantive charge put forward by the grand jury. *Ex parte Bain,* 121 U.S. 1, 10, 7 S.Ct. 781, 30 L.Ed. 849 (1887). An exception to this rule is made for changes which are merely a matter of form rather than substance, *Russell v. United States,* 369 U.S. 749, 770, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962); *Stirone v. United States,* 361 U.S. 212, 217, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), so long as there has been no modifi-

cation of the elements of the crime from that charged by the grand jury, *United States v. DeCavalcante*, 440 F.2d 1264, 1269–1272 (3d Cir. 1971).

■ We find that the government's proffer that the defendant actually used part of said loan proceeds for personal purposes other than loan repayment is a substantial modification of the government's theory of conversion, which is an essential element of the crime of misapplication as discussed above. The government's offer would cause more than a mere variance of proof, because "the charging terms of the indictment are altered" by the prosecutor after the grand jury last passed upon them, *United States v. DeCavalcante, supra,* 440 F.2d at 1271, *quoting Gaither v. United States,* 134 U.S.App.D.C. 154, 164, 413 F.2d 1061, 1071 (1969). The prosecutor would inject material facts regarding the conversion of the loan proceeds, potentially depriving the defendant of "a basic protection which the guaranty of the intervention of a grand jury was designed to secure. For a defendant could then be convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury which indicted

him." *Russell v. United States, supra,* 369 U.S. at 770, 82 S.Ct. at 1052.

For these reasons we must deny the government's request to retain nine of the challenged counts pending proof of conversion to personal use at trial, and we will grant the defendant's motion to dismiss Counts 6, 7, and 17 through 25.

## II. *Conspiracy to Misapply Bank Funds—Count I*

The defendant argues that Count I of the superseding indictment, alleging conspiracy to misapply bank funds, is defective "because the conspiratorial objective which it alleges is no more than to have the bank lend to certain business entities money which would in fact be used by Michael himself." Defendant's Supp.Br. at 3–4. This conspiratorial objective is said to be conduct which is not a misapplication of funds because Count I does not explicitly allege that the nominal borrowers (defendant individually or corporations in which defendant was a principal) were incapable of repaying the loans. Count I is set forth in the margin.[7]

7. The conspiracy charge—Count I—provides in relevant part as follows:

1. At all times mentioned in this Indictment, the Trust Company of New Jersey, with its principal offices located in Jersey City, New Jersey, was a bank, the deposits of which were insured by the Federal Deposit Insurance Corporation.

2. At all times mentioned in this Indictment, the defendant, MURRAY H. MICHAEL, resided in the State of Florida, was a customer of the Trust Company of New Jersey, who borrowed in excess of $800,000.00 from said bank in his own name and in the names of certain business entities, of which he was a principal; including Mid-Florida Industries, Inc., Three M Investments, Inc.; Maximum One Limited; American Housekeeping, Inc.; Gallows Development Corporation; County Wide Management, Inc.; GA Chem., Inc.; Khem Troll, Inc.; MI Chem., Inc.; ORL Company, Inc.; LA Company, Inc.; JAX Chem., Inc.; Mid-State Management, Inc.; Mar. Company, Inc.; Osceola Management, Inc.

3. At all times mentioned in this Indictment, James M. Neveras, named herein as a co-conspirator but not as a defendant, was the Vice President—Commercial Lending of the Trust Company of New Jersey with re-

sponsibility for reviewing applications for loans and other extensions of credit.

4. From at least as early as in or about January of 1974, and continuing thereafter up to and including the date of the filing of this Indictment, the exact dates being unknown to the Grand Jury, in the District of New Jersey, and elsewhere, the defendant, MURRAY H. MICHAEL, together with the unindicted co-conspirator, James M. Neveras, and others, did knowingly, wilfully and unlawfully combine, conspire, confederate and agree with each other, and with others, to commit certain offenses against the United States, that is, to wilfully misapply and cause to be misapplied by the unindicted co-conspirator, James M. Neveras, an amount in excess of $100.00 of the monies, funds and credits of the Trust Company of New Jersey, with the intent to injure and defraud said Bank, in violation of Title 18, United States Code, Sections 656 and 2.

5. It was a part of said conspiracy that, in order to obtain funds for the personal use of the defendant, MURRAY H. MICHAEL, in connection with certain business ventures, the defendant, MURRAY H. MICHAEL, and the unindicted co-conspirator, James M. Neveras, caused the Trust Company of New Jer-

Under the First Circuit's decision in *United States v. Gens, supra,* favorably discussed by the Third Circuit in *United States v. Gallagher, supra,* the defendant properly points out that there is no "willful misapplication" unless it is also alleged that the conspiracy's purpose was to injure or defraud the bank. *Gens* held that it is not a willful misapplication for a bank official to grant a loan to a financially capable named debtor knowing that the proceeds will in fact be paid to a third party who is also financially capable, because there is no natural tendency to injure or defraud the bank. 493 F.2d at 222.

■ It is, however, a willful misapplication for a bank official knowingly (1) to grant a loan to a named debtor which was either fictitious or who was unaware that his name was being used, or (2) to grant a loan to a named debtor who was financially incapable of repaying the loan whose proceeds were passed to a third party, or (3) to grant a loan to a named debtor, regardless of his financial capabilities, intending to look for repayment only to a third party who actually received the proceeds, to whom the bank was unwilling to grant a formal loan. *Id.* at 221–222; *United States v. Gallagher, supra,* 576 F.2d at 1045–46.

■ The instant indictment sets forth a cause for conspiracy to misapply funds if it can fairly be said that the defendant is on notice that the purpose of the conspiracy was to misapply funds and at least one overt act is alleged toward' that purpose.

In considering the sufficiency of the pleading of the object of the conspiracy, the court notes that the conspiracy count need not allege the object of criminal misapplication as precisely as would be necessary in a substantive count standing alone. *United States v. Grizaffi,* 471 F.2d 69, 73 (7th Cir. 1972), *cert. denied sub nom. Svejcar v. United States,* 411 U.S. 964, 93 S.Ct. 2141, 36 L.Ed.2d 684 (1973); *see, also United States v. Knox Coal Co.,* 347 F.2d 33, 38 (3d Cir.), *cert. denied sub nom. Lippi v. United States,* 382 U.S. 904, 86 S.Ct. 239, 15

sey to loan approximately $833,000.00 to a series of business entities of which the defendant was a principal and to the defendant individually.

6. It was a further part of said conspiracy that in order to conceal from the Trust Company of New Jersey the true nature and purpose of the loans, referred to above in Paragraph 5 of this Count of the Indictment, the defendant and co-conspirator would:

A. Make applications for loans in amounts which the defendant and co-conspirator knew could be approved by the unindicted co-conspirator, James M. Neveras, without further review by other bank officials; and

B. Obtain and renew certain of the loans based upon false, fictitious, and fraudulent documents and information.

7. It was a further part of said conspiracy that the defendant, MURRAY H. MICHAEL, would meet with James M. Neveras for the purpose of securing loans from the Trust Company of New Jersey in return for money (kickbacks) to James M. Neveras of approximately ten percent (10%) of the face value of the loans.

8. It was a further part of said conspiracy that the defendant, and co-conspirator performed other acts to hide and conceal, and cause to be hidden and concealed, the purpose and the acts committed in furtherance of the conspiracy.

All in violation of Title 18, United States Code, Section 371.

*OVERT ACTS*

In furtherance of the conspiracy set forth above, and in order to effect the objects thereof, the defendant and co-conspirator did commit and cause to be committed the following overt acts, among others:

1. In or about January of 1974, the defendant, MURRAY H. MICHAEL, had a conversation with James M. Neveras in the District of New Jersey.

2. On or about January 29, 1974, James M. Neveras approved a loan by the Trust Company of New Jersey in the amount of $100,-000.00 in the name of MURRAY H. MICHAEL.

3. On or about February 8, 1974, the defendant, MURRAY H. MICHAEL, paid James M. Neveras a sum of $10,000.00 in the District of New Jersey.

[Acts 4–26, omitted herein, recite other loan transactions for various respective dates and amounts, sometimes to defendant personally, sometimes in the name of a corporation listed in ¶ 3 of the charging part. Several additional payments from defendant to alleged co-conspirator Neveras are also recited.]

All of the foregoing in violation of Title 18, United States Code, Section .371.

L.Ed.2d 157 (1965); *Brown v. United States*, 403 F.2d 489 (5th Cir. 1968), *cert. denied*, 397 U.S. 927, 90 S.Ct. 932, 25 L.Ed.2d 106 (1970); *Stein v. United States*, 313 F.2d 518 (9th Cir. 1962), *cert. denied*, 373 U.S. 918, 83 S.Ct. 1307, 10 L.Ed.2d 417 (1963).

■ In the instant case, the conspiracy count recites 28 overt acts, identifying by name, date and amount precisely the same alleged loan transactions as are detailed in the various substantive misapplication charges in Counts 2 through 25. The conspiracy count, however, does not incorporate the allegations of the substantive counts. Generally, each count of an indictment must stand alone unless there is an incorporation of the allegations of other counts, *Dunn v. United States*, 284 U.S. 390, 393, 52 S.Ct. 189, 76 L.Ed. 356 (1932). Although the overly mechanistic segregation of counts has been criticized as being incompatible with the letter and spirit of revised Rule 7, F.R.Crim.P., *see* 8 *J. Moore, Federal Practice* (Cipes ed. 1965) ¶ 7.04 at 7–19 & n. 12, there is considerable doubt that the essential allegations of one count may be impliedly incorporated into another count in the absence of express reference, *United States v. Huff*, 512 F.2d 66, 69 (5th Cir. 1975). This principle is not without exceptions; the Third Circuit has in fact recognized that a bare-bones allegation of a *substantive* count of willful misapplication will not be dismissed when it is accompanied by a detailed and explicit conspiracy count arising from the same time period naming the same defendants, *United States v. Moraites*, 456 F.2d 435, 440–441 (3d Cir.), *cert. denied*, 409 U.S. 891, 93 S.Ct. 109, 34 L.Ed.2d 148 (1972), with no indication that the substantive counts expressly incorporated the detailed allegations of the conspiracy count, *see* 456 F.2d at 440 n. 7.

■ The general statement of the conspiratorial objective in Count I is "to wilfully misapply . . . the monies . . . of the Trust Company . . . with the intent to injure and defraud said Bank." We need not decide whether this statement of the conspiracy's purpose impliedly incorporates the factual allegations of the remaining valid substantive misapplication counts because we find that Count I itself alleges facts sufficient to set forth the conspiratorial purpose of a particular species of misapplication of bank funds. The charging part of the conspiracy count alleges that defendant borrowed in excess of $800,000 from the bank in his own name and in the names of certain identified business entities of which he was a principal, that he conspired with Neveras to cause Neveras to willfully misapply funds and credits of the bank with intent to injure and defraud the bank in violation of sections 656 and 2, and that it was part of the conspiracy that Neveras caused the bank to loan approximately $833,000 to defendant individually and to the series of business entities in order to obtain funds for the defendant's personal use.[8] These loan proceeds are alleged to have been obtained by defendant and Neveras based upon false, fictitious and fraudulent documents and information, and in return for approving loans Neveras allegedly received kickbacks of approximately 10 percent of their face value.[9] Finally, the defendant and Neveras allegedly performed other acts to conceal the acts committed in furtherance of the conspiracy.

It is a direct implication from these allegations in the conspiracy count itself that the bank would not have approved the loans if it had known that defendant was the true recipient because a bribe or bribes was necessary to secure approval, false documents were necessary to conceal prior loans, and further concealment was apparently necessary to avoid discovery of their prior acts. In short, the conspiratorial purpose was to cause the bank to loan funds to named corporations for the actual use of defendant

---

**8.** *Id.*

**9.** *Id.*

Michael to whom it would not have loaned its funds if the true facts had not been concealed. (The direct loans naming Michael himself as debtor do not, of course, fall within this unlawful purpose.)

This conspiratorial purpose, quite apart from the allegations of the substantive counts, sets forth the objective of willful misapplication under the third *Gens* rationale *supra*, namely to grant a loan to a named debtor (a defendant-controlled corporation), regardless of its financial capabilities, intending to look for repayment, if at all, only to a third party (defendant Michael) who actually received the proceeds, to whom the bank was unwilling to grant a formal loan. This purpose is analogous to the misapplication in *United States v. Moraites, supra,* in which the loan officers granted loans to subsidiaries of a shipping management corporation (K & M), which would not be expected to repay the loans, when in fact the proceeds were to be expended for a third party (Bacalakis) who owned the subject vessels but to whom the bank's directors had barred making any further loans due to poor credit standing, 456 F.2d at 439–440. The existence of an analogous situation herein may be the subject of the government's conspiracy proofs at trial.

It is certainly true that Count I could have set forth the alleged criminal purpose more explicitly; a more direct statement might indeed be required to set forth the element of intent to defraud the bank in order to state a substantive offense of criminal misapplication. As noted above, however, "letter-perfect" specificity of each element is not required in a statement of conspiratorial purpose, *United States v. Knox Coal Co., supra,* 347 F.2d at 38.

■ For the above reasons we find that the requisite element of conversion of bank funds is set forth by implication from the facts alleged in the charging part of the conspiracy count. We hold that this conspiratorial purpose is alleged with sufficient clarity to perform the constitutionally-required dual functions of a well-plead indictment: to apprise the defendant of what charge he must meet as required by the Sixth Amendment, and to describe the offense with sufficient particularity that the defendant will not subsequently be placed in jeopardy for the same offense as required by the Fifth Amendment's double jeopardy clause.

Defendant's motion to dismiss Count I will be denied.

### III. *Travel Act—Counts 26, 27, 28*

The defendant challenges Counts 26, 27 and 28 which allege violations of the Travel Act, 18 U.S.C. § 1952, by travel in interstate commerce with intent to bribe bank officer Neveras in violation of the laws of New Jersey and of the United States. The defendant argues that such commercial bribery is not an "unlawful activity" for purposes of the Travel Act, and that even if the federal and New Jersey bribery statutes punish receipt of such a bribe they do not punish payment thereof.

The Travel Act provides in section 1952 in relevant part:

(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, . . . (is guilty)

(b) As used in this section "unlawful activity" means

(2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.

The indictment charges in these counts that defendant Michael traveled from Florida to New Jersey to promote an unlawful activity—bribery—in violation of N.J.S.A.

§ 2A:91–1 [10] and 18 U.S.C. § 215 [11] by paying Neveras a bribe on each of three occasions to procure loans from the bank.

The two circuit court decisions considering whether the Travel Act applies to commercial bribery have split in their views. The Second Circuit held in *United States v. Brecht,* 540 F.2d 45 (1976), *cert. denied,* 429 U.S. 1123, 97 S.Ct. 1160, 51 L.Ed.2d 573 (1977), that commercial bribery under the applicable New York law is not "bribery" for purposes of the Travel Act; the Fourth Circuit held in *United States v. Pomponio,* 511 F.2d 953 (4th Cir.), *cert. denied,* 423 U.S. 874, 96 S.Ct. 142, 46 L.Ed.2d 105 (1975), that "bribery" is not limited to corruption of public officials, under New York's commercial bribing statute, for Travel Act purposes.

The *Brecht* court echoed the general concern in *Rewis v. United States,* 401 U.S. 808, 812, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971), that the Travel Act should not be interpreted in a manner which alters sensitive federal-state relationships by converting a crime of relatively minor state stature into a federal felony. Under the statutory mechanism prevailing in New York—commercial bribery is a misdemeanor subject to not more than 3 months' imprisonment while bribery of a public official is punishable by up to 7 years' imprisonment—the *Brecht* argument has substantial force. It appears that the New York Legislature has confined its view of bribery as a serious crime to only those cases involving bribery of a public official, and the federal court

should respect this assessment when applying the state's law.

The term "bribery," like the other unlawful activity in section 1952(b)(2)—extortion and arson—must be interpreted under the Travel Act to include all state offenses which can be generically classified under those headings. *United States v. Dansker,* 537 F.2d 40, 47 (3d Cir. 1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

For example, the Supreme Court has made clear the view that section 1952 reaches private extortion in addition to traditional common law extortion of public officials, where the state "blackmail" laws applying to private shakedowns can fairly be said to fall within the generic term "extortion." *United States v. Nardello,* 393 U.S. 286, 292–296, 89 S.Ct. 534, 21 L.Ed.2d 487 (1968). In *Nardello,* the Court found that Congress intended the Travel Act to curb the activities of organized crime rather than merely of organized criminals who were also public officials. Extortionate methods were typically found to be employed by organized crime to enforce usurious loans, for example, between private parties.

Similarly, the Third Circuit held in *United States v. Dansker, supra,* that the Travel Act term "bribery" easily includes within its generic purview any payment or receipt of money, even among private parties, in exchange for an agreement to influence any official action with corrupt intent, as

**10.** N.J.S.A. § 2A:91–1 provides in relevant part:
> Any officer . . . of a . . . trust company, . . . who, directly or indirectly, asks for, demands, exacts, requires, receives or accepts, for his personal use, benefit or advantage, any money, or any other property or other thing, or any credit, or any promissory note, bill of exchange, check or other evidence of debt, or any security, promise, contract, covenant, agreement or obligation, express or implied, for the payment, delivery, alienation or transfer of any money, property or other thing, or for the performance or rendering of any act or service, as a bribe, present, reward, inducement, commission or fee for loaning any funds of or giving any credit on behalf of such . . . trust company . . . or for recommending, approving, voting for or consenting to the making of any loan or the giving of any credit by such . . . trust company, . . . is guilty of a misdemeanor.

**11.** 18 U.S.C. § 215 provides in relevant part:
> Whoever, being an officer . . . of any bank, the deposits of which are insured by the Federal Deposit Insurance Corporation, . . . receives or consents or agrees to receive any fee, commission, gift, or thing of value, from any person, firm, or corporation, for procuring . . . from any such bank . . . any loan or extension or renewal of loan or substitution of security, . . . shall be fined not more than $5,000 or imprisoned not more than one year or both.

those terms are used in N.J.S.A. § 2A:93–6 regarding the misdemeanor (providing for up to 3 years' imprisonment) of giving or accepting bribes in connection with government work, service or approval.

■■■ In the instant case, the relevant New Jersey bribery statute, N.J.S.A. § 2A:91–1, provides that it shall be a misdemeanor punishable by up to 3 years' imprisonment for any bank official to accept money as an inducement or fee for loaning any funds or giving credit on behalf of his or her bank. Under other bribery provisions, giving or receiving the bribe to a judge or legislator is a high misdemeanor (7 years); receiving a bribe as a state, county or municipal officer or member of a public authority in return for a vote as a member thereof is a misdemeanor (3 years); and giving or receiving the bribe of any person in order to obtain or secure any state, county or municipal governmental service or approval is a misdemeanor (3 years); see N.J.S.A. §§ 2A:93–1, 2, 4, 6. It can fairly be concluded that the State attaches equal importance to bribery of a bank official and bribery of a public official (other than a judge or legislator). Recognizing bribery of a bank official as one species of the generic term "bribery" would be consistent with New Jersey law and policy, and such a recognition would not contravene the concern in *Rewis v. United States, supra,* against converting a minor state offense into a federal felony.[12]

Similarly, the legislative history of the Travel Act, while nowhere mentioning commercial bribery, *United States v. Niedelman,* 356 F.Supp. 979 (S.D.N.Y.1973), does disclose a pronounced congressional intent to shut off illicit revenue sources to organized crime.[13] Attorney General Robert Kennedy wrote in 1961 that the effect of the Travel Act proposal would be to impede the clandestine flow of profits from criminal ventures. 1961 *U.S.Code Cong. & Admin.News,* p. 2664. When the Travel Act was amended in 1965, arson was included because Congress found that arson for insurance had become one of the ways in which persons who are indebted to racketeers are enabled to pay their debts. This strong expression of the federal legislation's purpose to deprive crime syndicates of sources of income was manifested in the Senate Report, set forth in 1965 *U.S.Code Cong. & Admin.News,* pp. 1847–48. Therefore, interpreting the Travel Act to include the bribery of a bank officer to obtain loans would be consistent with the congressional intent of stemming the flow of capital to organized crime.

12. It should also be noted that the factual context of commercial bribery in this case has a more aggravated impact upon the public interest in stemming the flow of illicit revenue than did the activity in *United States v. Brecht, supra.* In *Brecht,* the defendant was an employee of Westinghouse who demanded a $1,000 kickback for the award of a commercial contract to a subcontractor. Bribery of a federally-insured bank's loan officer to obtain loan approval, as both a potential threat to the stability of the federal banking system and a source of illicit revenue, falls into the generic zone of bribery for Travel Act purposes and far beyond that involved in *Brecht's* private commercial transaction.

13. In *United States v. Nardello, supra,* 393 U.S. at 292–293, 89 S.Ct. at 538, Chief Justice Warren wrote:

The Travel Act, primarily designed to stem the "clandestine flow of profits" and to be of "material assistance to the States in combating pernicious undertakings which cross State lines," thus reflects a congressional judgment that certain activities of organized crime which were violative of state law had become a national problem. The legislative response was to be commensurate with the scope of the problem. Appellees suggest, however, that Congress intended that the common law meaning of extortion—corrupt acts by a public official—be retained. If Congress so intended, then § 1952 would cover extortionate acts only when the extortionist was also a public official. Not only would such a construction conflict with the congressional desire to curb the activities of organized crime rather than merely organized criminals who were also public officials, but also § 1952 imposes penalties upon any individual crossing state lines or using interstate facilities for any of the statutorily enumerated offenses. The language of the Travel Act, "whoever" crosses state lines or uses interstate facilities, includes private persons as well as public officials. [Footnotes omitted.]

The Travel Act would similarly apply to interstate travel to facilitate the bribing of a bank officer to obtain a loan in violation of the relevant federal statute, 18 U.S.C. § 215.[14]

The defendant contends that even if the receipt of a bribe by a bank officer in exchange for loan approval falls within the generic term "bribery" under the Travel Act, neither N.J.S.A. 2A:91–1 nor 18 U.S.C. § 215 may be construed to punish the payor of the bribe since each statute by its terms prohibits only the *receipt* of such a bribe and is mute concerning the payment. The defendant argues that these are statutes which punish only one party to a transaction which inevitably requires the participation of two persons; the other party cannot be held criminally liable as an aider and abettor or co-conspirator, since to do so would violate the legislative policy. *Gebardi v. United States*, 287 U.S. 112, 53 S.Ct. 35, 77 L.Ed. 206 (1932).

In *Gebardi*, the petitioners were a man and a woman convicted of conspiracy to violate the Mann Act, now 18 U.S.C. § 2421, by the man's transporting of the woman across state lines for immoral purposes. The statute substantively punishes only the person who so transports a woman; the woman's consent to such conduct does not place her within the ban of the statute unless she actively aids or assists someone else in her own transportation. 287 U.S. at 119, 53 S.Ct. 35. The woman's mere acquiescence was not made a crime under the Mann Act; in such a case, the Court held that "we perceive in the failure of the Mann Act to condemn the woman's participation in those transportations which are effected with her mere consent, evidence of an affirmative legislative policy to leave her acquiescence unpunished." 287 U.S. at 123, 53 S.Ct. at 38.[15]

*Gebardi* also recognized that "where it is impossible under any circumstances to commit the substantive offense without co-op-

erative action, the preliminary agreement between the same parties to commit the offense is not an indictable conspiracy," 287 U.S. at 122, 53 S.Ct. at 37, *citing inter alia United States v. Dietrich*, 126 F. 664 (C.C. Neb.1904), which reversed a conviction for conspiracy to violate a statute punishing the receiver and the giver of a bribe to a member of Congress. In *Dietrich*, where the sole alleged conspirators are the giver and the receiver of the bribe, they may not be charged with a separate conspiracy where their agreement to transact the bribe is itself an indispensable element of the substantive offense, 126 F. at 667.

The question is whether *Gebardi* and *Dietrich* would bar prosecution of the defendant as an alleged bribe-giver for aiding and abetting the bank officer's violation of the relevant federal and state statutes which punish only the bank officer's agreement to receive such a bribe. The answer depends upon whether there is an affirmative legislative policy to leave the bribe-giver's conduct unpunished. *United States v. Gebardi, supra.*

Under the relevant federal statutes, several courts have held that the payor of a bribe to a bank officer may be punished as an aider and abettor in violation of 18 U.S.C. §§ 215 & 2, *United States v. Tokoph*, 514 F.2d 597, 602 (10th Cir. 1975); *United States v. Foster*, 566 F.2d 1045, 1047–48 (6th Cir. 1977) [briber of loan officer is conspirator to violate § 215]. *See United States v. Kenner*, 354 F.2d 780, 785 (2d Cir. 1965), *cert. denied*, 383 U.S. 958, 86 S.Ct. 1223, 16 L.Ed.2d 301 (1966) [and cases cited therein] for the proposition that a payor of a bribe can be an aider and abettor under 18 U.S.C. § 2. In amending 18 U.S.C. § 2 in 1951, Congress intended to reach persons who are otherwise exempt from punishment as principals, as the Senate Report stated:

**14.** *See* note 11 *supra.*

**15.** A conspiracy charge would not fail, however, if it alleges that there was concerted ac-

tion among a greater number of parties than is necessary to commit the substantive offense. *Gebardi v. United States, supra*, 287 U.S. at 122 n. 6, 53 S.Ct. 35.

This section is intended to clarify and make certain the intent to punish aiders and abettors regardless of the fact that they may be incapable of committing the specific violation which they are charged to have aided and abetted.

1951 *U.S.Code Cong. & Admin.News*, pp. 2578, 2583. We find no post-1951 federal case which would lead to a contrary result. We find that Congress, by amending the aiding and abetting statute, intended to eliminate any inference that the language of § 215's predecessor might preclude prosecution of a bribe-giver as an aider and abettor. We find no affirmative congressional policy to leave a bribe-giver's conduct unpunished under 18 U.S.C. §§ 215 & 2.

■ The relevant New Jersey law is less clear. The aiding and abetting statute, N.J.S.A. § 2A:85–14, was first enacted in 1951, L.1951, 1st Sp.Sess., Ch. 344, § 85–14, providing like its federal counterpart [16] that "Any person who aids, abets, counsels, commands, induces or procures another to commit a crime is punishable as a principal. Any person who wilfully causes another to commit a crime is punishable as a principal." We have found no New Jersey decision regarding whether one who pays a bribe is liable as an aider and abettor in the crime of receiving the bribe.

The applicability of *Gebardi* and *Dietrich* principles in a commercial bribery context was considered by the trial court in *State v. Aircraft Supplies, Inc.*, 45 N.J.Super. 110, 131 A.2d 571 (L.Div.1957). The giving and receiving of a commercial kickback to an employee who is a purchasing agent, from a person who furnishes goods or services by sale or contract, are punishable as disorderly persons offenses under N.J.S.A. § 2A:170–88. The court held that the defendant givers and receiver may not be charged with the misdemeanor of conspiracy where that commercial bribery offense

necessarily requires the same concerted action of the same parties and punishes the parties as disorderly persons. 45 N.J.Super. at 121, 131 A.2d at 577. The court held that prosecution of the parties as conspirators would impermissibly override the legislative intent to: (1) limit the punishment as a disorderly offense to one year; (2) limit the statute of limitations for prosecution of such conduct to one year; and (3) grant statutory immunity from prosecution to any person (giver or receiver) who may have committed an offense under § 2A:170–88 but who then reports the transaction and cooperates with the prosecutor under § 2A:170–89.[17] *Id.* at 121–123, 131 A.2d at 577–578.

We cannot say that a similar frustration of legislative intent would result from subjecting the alleged giver of a bribe to a bank officer to liability as an aider and abettor under N.J.S.A. §§ 2A:91–1 & 2A:85–14. We are directed to no authority which would suggest that the New Jersey Legislature did not intend for the 1951 aiding and abetting statute to operate with a breadth equal to its contemporary federal counterpart, namely to reach persons as aiders and abettors who are otherwise incapable of committing the underlying substantive crime as principals. We do not imagine that the Legislature intended to immunize the giver of a criminal bank loan kickback from the obvious impact of the aiding and abetting statute. Finally, we do not perceive that bribe-paying in return for favorable bank loan decisions is the type of activity which is most often held to be legislatively immunized from collateral prosecution in *Gebardi*-type cases, which typically involve legislative recognition of a protected class of persons who, although participating in the crime, are thought to be its victims. For example, protecting a class

---

**16.** Compare 18 U.S.C. § 2(a), *supra* note 2.

**17.** A similar statutory immunity, immunizing from prosecution for criminal abortion any person who gives testimony against another participant in the crime, was held to be plain evidence of an affirmative legislative policy behind the purposeful failure of the abortion statute to condemn the participation of the woman upon whom the abortion was performed. *In re Vince*, 2 N.J. 443, 451, 131, 67 A.2d 141, 145 (1949). There is no comparable testimonial immunity statute for violators of N.J.S.A. 2A:91–1 in the instant case.

of perceived victims from punishment would explain the legislative decision to punish the doctor who performs a criminal abortion but not the woman who procures it, *In re Vince,* 2 N.J. 443, 451, 67 A.2d 141, 144–145 (1949).

For these reasons we hold that a person alleged to have paid a fee proscribed by the bank bribery statute, N.J.S.A. § 2A:91–1, may be prosecuted as a principal through the aiding and abetting statute, N.J.S.A. § 2A:85–14.

The defendant last argues that even if the alleged bribe paying violates state and federal laws, the Travel Act does not apply to the defendant's alleged conduct which defendant characterizes as traveling to purchase the services of the principal in the illegal activity. The defendant relies upon *Rewis v. United States, supra,* 401 U.S. at 811, 91 S.Ct. at 1059, wherein the Court held that interstate travel by mere customers of a gambling establishment does not satisfy section 1952's requirement of interstate travel with intent to "promote, manage, establish, carry on, or facilitate" the proscribed illegal activity, because "the ordinary meaning of this language suggests that the traveler's purpose must involve more than the desire to patronize the illegal activity."

This argument lacks merit because the defendant mischaracterizes the charge against him. Far beyond alleging that the defendant traveled to patronize illegal activity, the indictment alleges that the defendant traveled with intent to pay the bribe—*i. e.,* to commit the crime of bribery condemned at state and federal law. The defendant's alleged travel and conduct not only "facilitated" or "promoted" the illegal bribery, but this conduct was indeed indispensable to the commission of the alleged bribery. In short, defendant is alleged to have traveled with intent to be a principal in a criminal enterprise, and not a mere patron of an ongoing local criminal enterprise.

Such travel with intent to commit bribery, arson or extortion is clearly proscribed by the very language of section 1952. *See*

*United States v. Nardello, supra; United States v. Barrow,* 363 F.2d 62, 64–65 (3d Cir. 1966), *cert. denied,* 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967); *United States v. Zirpolo,* 288 F.Supp. 993, 1008–1010 (D.N.J.1968), *rev'd on other grounds,* 459 F.2d 424 (3d Cir. 1971).

Defendant's motion to dismiss Counts 26, 27 and 28 will be denied.

The accompanying Order is entered.