IN THE MATTER OF LILLIAN DEL GOBBO VINCE, CHARGED WITH CRIMINAL CONTEMPT OF COURT.

Argued May 23, 1949—Decided June 30, 1949.

*Mr. T. Girard Wharton,* Prosecutor of the County of Somerset, argued the cause for the petitioner, State of New Jersey.

*Mr. John Vr. Strong* (*Messrs. Strong & Strong,* attorneys) argued the cause for the respondent.

The opinion of the court was delivered by

BURLING, J. This mattter comes before us on certification granted upon the application of the State to review an order of the Law Division of the Superior Court, Somerset County, discharging an order to show cause why the respondent, Lillian Del Gobbo Vince, should not be ordered to answer certain questions propounded to her while a witness before the Somerset grand jury. The facts are not in dispute.

On June 10, 1948, the respondent, a married woman who had separated from her husband a short time previously, was admitted to a hospital in Somerville with a high fever and an infected vagina. As a result of the history given by her and of a phyiscal examination, the attending physician determined that an abortion had been performed upon the respondent at a time when she was eight to ten weeks pregnant, although the child had not yet quickened. The same physician had examined respondent on May 14, 1948, at which time he had diagnosed probable pregnancy of five or six weeks duration. Respondent was subsequently interrogated in the County Prosecutor's office, at which time she stated that a criminal abortion had been performed upon her by two persons.

On September 21, 1948, respondent appeared before the grand jury of Somerset County in compliance with a subpœna directed to her and there was propounded to her a series of questions relating to her pregnancy and the commission of an abortion upon her. She refused to answer on the ground that the answers might tend to incriminate her. The Prosecutor then filed a petition with the Law Division of the Superior Court and obtained an order to show cause why she should not be compelled to answer the questions propounded or, upon her refusal, be adjudged guilty of contempt. On the return of the rule the respondent advanced the proposition that she was entitled to the privilege of refusal to answer upon the ground that the answers might tend to incriminate or tend to disgrace her. On December 22, 1948, the court below rendered an opinion deciding that the respondent should not be compelled to answer on both grounds and ordered the rule discharged. We granted certification upon the petition of the State because the questions involved were of great public importance. *Rule* 1:5–3(b).

The issue thus squarely presented is whether a woman upon whom an abortion is allegedly performed is privileged to refuse to answer material and relevant questions propounded to her while a witness, basing such refusal upon the ground that such answer might tend to incriminate or degrade her. The respondent's refusal in the instant case was justifiable if either of the two grounds advanced are sound. Parenthetically it may be noted that, of necessity, the refusal based upon the first ground involves only the question of a woman upon whom an abortion has been performed while the second ground is broader and is applicable to any witness.

No witness shall be compelled to answer any question if the answer will expose him to a criminal prosecution or penalty. *R. S.* 2:97–7. We need not enter into a discussion of the common law rule in view of the mandate of the statute except to note that the statute is merely declaratory of the common law. *Fries v. Brugler*, 12 *N. J. L.* 79, 82 (*Sup. Ct.* 1830). This privilege, while existent at the common law is a creature of the public policy of this State and

is not required by the Fourteenth Amendment to the Constitution of the United States. *Adamson v. California,* 332 *U. S.* 46, 54, 67 *Sup. Ct.* 1672, 91 *L. Ed.* 1903, 1910 (*U. S. S. Ct.* 1947). The privilege against self-incrimination contained in the Fifth Amendment to the Constitution of the United States only applies to the federal government and not to the individual states. *Adamson v. California, supra; Twining v. New Jersey,* 211 *U. S.* 78, 29 *Sup. Ct.* 14, 53 *L. Ed.* 97, 112 (*U. S. S. Ct.* 1908). Nor is a similar provision to be found in the Constitution of this State. Respondent's contentions that her constitutional rights were infringed are therefore without merit.

■ ■ Respondent would only be justified in claiming the privilege against self-incrimination if, as a result of her testimony, she might be prosecuted for a violation of the criminal laws of this State. It becomes necessary, therefore, to ascertain what prosecution, if any, could ensue as a result of answers to the propounded questions. It is apparent that the only possible crimes with which respondent might be charged are common law abortion, abortion under *R. S.* 2:105–1 and conspiracy to commit abortion. The common law crime of abortion is not committed unless the mother be quick with child. A review of common law authorities is unnecessary in view of the discussion of Mr. Chief Justice Green in *State v. Cooper,* 22 *N. J. L.* 52 (*Sup. Ct.* 1849). Since respondent was not quick with child at the time of the alleged abortion she cannot be indicted for the common law crime or for conspiracy to commit common law abortion and any claim of privilege grounded upon the supposition that she can be so indicted is without merit.

■ ■ Following the decision in *State v. Cooper, supra,* the Legislature, in 1849, adopted the act of March 1, 1849, *Nix. Dig.* 177, § 103. This statute, with some few alterations not here material, subsists today as *R. S.* 2:105–1, and reads as follows:

"Any person who, maliciously or without lawful justification, with intent to cause or procure the miscarriage of a woman then pregnant with child, shall:

"a. Administer to her, prescribe for her, or advise or direct her to take or swallow any poison, drug, medicine or noxious thing; or

"b. Use any instrument or means whatever—shall be guilty of a high misdemeanor.

"If as a consequence thereof, the woman or child shall die, the person committing the offense shall be punished by a fine not exceeding five thousand dollars, or by imprisonment at hard labor not exceeding fifteen years, or both."

While it has been held that the statute does not require the quickening of the child, *State v. Loomis,* 89 *N. J. L.* 8 (*Sup. Ct.* 1916); affirmed, 90 *N. J. L.* 216 (*E. & A.* 1916), it was long ago decided that, in view of the wording of the statute, the woman could not be held to be either a principal or an accomplice. *State v. Murphy,* 27 *N. J. L.* 112, 114 (*Sup. Ct.* 1858); *State v. Hyer,* 39 *N. J. L.* 598, 600 (*Sup. Ct.* 1877). The reason for the rule was explained by Mr. Chief Justice Green, who wrote the opinion in *State v. Cooper, supra,* in *State v. Murphy, supra,* as follows:

At page 114: "Nor does the statute make it criminal for the woman to swallow the potion, or to consent to the operation or other means used to procure an abortion. No act of hers is made criminal by the statute. Her guilt or innocence remains as at common law. Her offence at the common law is against the life of the child. The offence of third persons, under the statute, is mainly against her life and health. The statute regards her as the victim of crime, not as the criminal; as the object of protection, rather than of punishment."

The statute and construction thereof make it plain that a woman who performs an abortion upon herself or consents to its performance upon her by others is chargeable criminally only if the child were quick, a factor lacking in the instant case.

Moreover, complete protection is afforded the woman by *R. S.* 2:105–2 which reads as follows:

"Any person who shall cause or attempt to cause the miscarriage of a pregnant woman shall be a competent witness, and may be compelled to testify against any other person charged with so offending, but the testimony of such person given in any such case shall not be used in any prosecution, civil or criminal against the person so testifying."

It is true that the statute does not expressly state that the testimony of the pregnant woman shall be compellable. However, we think it plain that she is to be included in the category of "Any person who shall cause or attempt to cause" an abortion. Abortions are caused with and not against the will of the prospective mother.

Further, *R. S.* 2:105–1 and its companion section *R. S.* 2:105–2, which affords limited immunity against the use of their testimony against persons testifying against one charged with having committed the crime of statutory abortion, provide a clear expression of policy in aid of and to facilitate the detection and prosecution of those engaged in criminal abortion. The failure of the statutes to condemn the participation of the subject woman in an abortion performed upon her is plain evidence of an affirmative legislative policy to leave her acquiescence unpunished. Compare *Gebardi v. U. S.*, 287 *U. S.* 112, 123, 53 *Sup. Ct.* 35, 77 *L. Ed.* 206, 211 (*U. S. S. Ct.* 1932). The Legislature was obviously aware of the fact that in the normal case, it is only through the cooperation and testimony of the subject woman that the abortionist could be ferreted out and convicted. Were we to hold that the subject woman is amenable to prosecution either for conspiracy to commit abortion or for solicitation such determination would fly in the face of and constitute an unwarranted contravention of this policy. Inasmuch as the respondent under the circumstances here present is not chargeable criminally with common law abortion, statutory abortion, solicitation to commit abortion or conspiracy to commit abortion, it necessarily follows that her refusal to answer the questions propounded on the ground that her answers might tend to incriminate her was not well founded.

Respondent also based her refusal to answer upon the ground that such answers would tend to degrade her. In justification for this action reliance was placed upon the cases of *State v. Mohr*, 99 *N. J. L.* 124 (*E. & A.* 1923) ; *Vineland v. Maretti*, 93 *N. J. Eq.* 513 (*Ch.* 1922) ; *In re Hudson County Bar Ass'n*, 109 *N. J. L.* 275 (*Sup. Ct.* 1932), and certain other cases hereinafter discussed. Conflict between

these cases and *R. S.* 2:97–6 and 7, and the construction thereof in *State v. Fox,* 25 *N. J. L.* 566 (*Sup. Ct.* 1856), formed part of the basis for our granting certification.

The privilege against answers that disgrace or degrade has had a checkered history. It was recognized and applied by Lord Chief Justice Treby in *Cook's Trial,* 13 *How. St. Tr.* 334 (1696). However, in the 18th century the privilege fell into disuse. Lord Chief Baron Gilbert's treatise on Evidence, published in 1769 fails to mention the privilege, although he does mention the privilege against self-incrimination (*3rd Ed.* 1769, *p.* 140). In *Peake on Evidence* (*1st Am. from 3d Eng. Ed.* 1818), at *p.* *129, it is stated that the practice of asking such questions "had so long continued without objection, that no one at the bar thought of questioning the legality of it" but that some of the judges had lately laid down a different rule which applied the privilege. The most cited of these later English cases is *Rex v. Lewis,* 4 *Esp.* 225, 170 *Eng. Rep.* 700 (*Court of King's Bench,* 1802), where during a prosecution for assault the prosecuting witness was asked if he had not been in a house of detention. Lord Ellenborough interposed and stated that it had formerly been decided that a witness was not bound to answer any question, the object of which was to degrade him or make him infamous. To the same effect is *MacBride v. MacBride,* 4 *Esp.* 242, 170 *Eng. Rep.* 706 (*King's Bench* 1802), the trial judge likewise applying the privilege on his own motion. Other cases holding likewise are collected in 3 *Wigmore, Evidence* (*3rd Ed.* 1940), *p.* 569, *note* 14. However the courts were not unanimous. In *Cundell v. Pratt, Moody & Malkin* 108, 173 *Eng. Rep.* 1098 (*Court of Common Pleas,* 1827), and *Parkhurst v. Lowter,* 1 *Meriv.* 390, 400, 35 *Eng. Rep.* 718, 721 (*High Court of Chancery* 1816), the courts refused to allow the privilege and directed that the questions be answered.

██ ██ It thus appears that the common law authorities were not unanimous in their views. In view of the fact that the later authorities allowing the privilege were decided after the Revolution it is doubtful whether the privilege against disgrace formed part of the common law applicable in this

State. We are not bound by any English case decided after the·Revolution. *Louden v. Louden*, 114 *N. J. Eq.* 242, 252 (*E. & A.* 1933). As to the state of the common law, the failure of Lord Chief Baron Gilbert to mention the existence of any such privilege, in a work published but seven years before the Revolution, corroborated by the statements of Peake, is highly significant and leads to the inference that such privilege did not exist at the time this State proclaimed its independence.

The Constitution of the United States contains no provision conferring privilege upon a witness against disgrace or degradation.

With this in mind we turn to the New Jersey precedents. It must first be noted that the State Constitutions have been silent as to the point in question. Such a privilege is thus not one which is to be classified as a constitutional right. *State v. Bailly*, 2 *N. J. L.* 396 (*Sussex Oyer and Terminer* 1807), is the first reported case in point. In that case a witness was asked if he had not been convicted of petit larceny. The court sustained an objection to the question, relying upon a decision by Lord Ellenborough. While the case relied upon is not cited it is probably *Rex v. Lewis, supra,* decided five years prior.

Other early New Jersey cases allowing the privilege are *Vaughn v. Perine*, 3 *N. J. L.* *728 (*Sup. Ct.* 1811); *Fries v. Brugler, supra,* and *State v. Spencer*, 21 *N. J. L.* 196, 199 (*Hudson Oyer and Terminer* 1846). An examination of these cases discloses that the authorities relied upon to support them are either *State v. Bailly, supra,* or are English cases postdating the Revolution.

We conclude that the reasoning of these New Jersey cases as expositions of the common law is not convincing.

Nine years after *State v. Spencer, supra,* was decided the Legislature enacted the act of April 5, 1855 (*Nix. Dig.* 883, § 4), which is found presently in *R. S.* 2:97-6 and 7. These two sections read as follows:

2:97-6. "Except as otherwise provided by statute, a witness shall not be excused from answering any questions relevant and material to the issue."

2:97–7. "No witness shall be compelled to answer any question if the answer will expose him to a criminal prosecution or penalty or to a forfeiture of his estate."

It is significant that the immunities tabulated in *R. S.* 2:97–7 do not include a privilege against disgrace. In view of the earlier New Jersey decisions reviewed above, which recognized the privilege although resting upon an unfirm foundation, the omission thereof in the legislative act would appear to clearly indicate an intent that such a privilege was to be disallowed.

Such was the construction placed upon the act by the former Supreme Court in *State v. Fox, supra,* when that court stated:

At page 599: "* * * The only ground upon which his evidence has been excluded is, that he shall not be called on to testify to his own disgrace. This objection, as applicable to witnesses generally, is removed by the fourth section of the act of April 5. 1855, (*Nix. Dig.* 888 § 4), by which it is enacted, that a witness shall not be excused from answering any question relevant and material to the issue, provided the answers will not expose him to a criminal prosecution or penalty, or to a forfeiture of his estate. No reason is perceived why a juror, sworn to testify upon the issue of his own competency is not within the operation, as he is clearly within the letter of this enactment. The statute operates to alter the common law rule, that a juror shall not be examined as to any disqualification tending to his own disgrace. Upon this point, the rule adopted in *The State v. Spencer* is superseded by the statute."

In this state of the law the answer appears to be clear that no such privilege exists. However, despite the statute the former Court of Chancery ruled in *Rusling v. Bray,* 37 *N. J. Eq.* 174, 175 (*Ch.* 1883), that the privilege against disgrace existed. The authority relied upon for this statement was 1 *Greenl. on Ev.,* §§ 451-454. Compare *Roop v. State,* 58 *N. J. L.* 479, 481 (*Sup.* 1896), denying the privilege and likewise relying on the same treatise. In neither case was the statute or *State v. Fox, supra,* cited. In *Vineland v. Maretti, supra,* the former Court of Chancery stated the privilege to exist, citing *Fries v. Brugler, supra.* An examination of the opinion discloses that the language of the court was directed towards the privilege against self-incrimination, so that the

statement recognizing the privilege against disgrace is *dictum*. Shortly after *Vineland v. Maretti, supra,* was decided it was cited by the Court of Errors and Appeals in *State v. Mohr, supra,* in the following language: "As was stated by the present Chancellor in the case of *Vineland v. Maretti, supra,* a witness is not bound to answer a question where the answer thereto will criminate or disgrace him. The protection against self-incrimination, however, is the privilege of the witness, and he may waive that privilege * * *." It is apparent from the quoted remarks and from an examination of the opinion that the Court of Errors' attention was directed, as was the Court of Chancery's in *Vineland v. Maretti, supra,* towards the privilege against self-incrimination and not the privilege · against disgrace. The same observation may be made as to the opinion of the former Supreme Court in *In re Bar Association of Hudson County, supra,* wherein is found a statement similar to and relying upon *State v. Mohr, supra.* We think it obvious that in all of the cases relied upon by the respondent the question now before us was not presented to the courts concerned and the above mentioned statements are *dicta.*

In view of the absence of any decision since the Revolution by any court of the last resort in this State squarely deciding the question, and bearing in mind the conflicting decisions in the lower courts since that date, we are free to adopt that rule which appears to be best suited for the ascertainment of truth and the advancement of justice, in the light of the intent of the Legislature ·expressed in *R. S.* 2:97–6 and 7.

In our view the meaning of *R. .S.* 2:97–6 and 7 is plain. Assuming without deciding that a privilege against disgrace existed in this State prior to the enactment of the statute, the intent that it should not now exist is plain. Had the Legislature intended such a privilege to exist it would have said so in its tabulation of exemptions. At the time of enactment of the statute, not only the New Jersey authorities heretofore mentioned were before the Legislature, but also the federal rule as found in the Fifth Amendment to the

United States Constitution. Where the policy and purpose of the statute indicate that the common law was intended to be superseded and the working of the statute is so complete that it reasonably appears to be exclusive, the maxim *expressio unius est exclusio alterius* may be said to be applicable. 2 *Sutherland Statutory Construction* (3rd Ed. 1943), § 4915, p. 412 and p. 418, n. 27. The statute under construction is within the scope of that rule and we accordingly apply it and hold the privilege against disgrace not to exist in this State.

Moreover we are given another manifestation of the intent of the Legislature by an examination of R. S. 19:34–60, and its legislative history. That section of the Election Act, definitely allowing a privilege against disgrace, has its origin in *chapter* 187, *Laws of* 1930, § 492, p. 908. Its forerunner was *chapter* 139, *Laws of* 1898, § 213, p. 330 (2 C. S. 1910, p. 2141, § 213). The 1898 statute contained no such privilege. If the Legislature of 1930 had considered a privilege against disgrace to be already existent it would not have felt it necessary to have inserted the privilege in the statute.

In holding as we do that a privilege against disgrace does not exist, we find ourselves conformable to the majority of jurisdictions. The privilege against disgracing answers has disappeared in all but one or two jurisdictions. The cases are collected in 3 *Wigmore, Evidence* (3rd Ed. 1940), § 987, n. 1, pp. 572-617. Refer also to 3 *Wharton, Criminal Evidence* (11th Ed. 1935), § 1119, p. 1952; 58 *Am. Jur.*, "Witnesses," § 35, p. 42; *Brown v. Walker,* 161 *U. S.* 591, 16 *S. Ct.* 644, 40 *L. Ed.* 819 (*U. S. S. Ct.* 1896); *Smith v. U. S.,* 69 *Sup. Ct.* 1000, 1005 (*U. S. S. Ct.* 1949); 8 *Wigmore, Evidence* (3rd Ed. 1940), § 2255, p. 327. The Model Code of Evidence of American Law Institute, in accordance with the majority rule, omits this privilege from the group of those permitted a witness. Refer to *Model Code of Evidence, Rules* 201-234.

▆▆▆ Were we without the aid of the statute (2:97-6 and 7) and of *State v. Fox, supra,* we should arrive at the same conclusion as regards the existence of the privilege against disgrace. It must be borne in mind that litigation entails

serious consequences for those engaged therein. Upon the success or failure of a trial may depend life, liberty or the enjoyment of property. The niceties of personal feelings cannot be allowed to conflict with the duties of the courts to administer justice. Ample safeguards exist against violation of constitutional rights and, to borrow from Mr. Justice Holmes, these rights will not be destroyed "while this court sits." (Dissenting opinion, *Panhandle Oil Co. v. Miss.*, 277 *U. S.* 218, 72 *L. Ed.* 857, 859 (*U. S. S. Ct.* 1928)). But the privilege against disgrace is not a constitutional right or, indeed, any right at all. To the end that the whole relevant truth be obtained, it is to be recalled that the cardinal principle is that all relevant evidence is to be admitted unless some specific rule forbids it. *Hampton v. P. R. R.*, 115 *N. J. L.* 168, 169 (*E. & A.* 1935) ; 1 *Wigmore, Evidence* (*3rd Ed.* 1940), § 10, *p.* 293.

In compelling an answer to questions of this type the law is not compelling the witness to tell anything but the truth. "The truth is always the truth, and telling the truth will not hurt anyone except in so far as he ought to be hurt." *Quirk v. Quirk*, 259 *Fed.* 597, 599 (*D. C. Cal.* 1919). The policy of the law is to arrive at the truth. This philosophy is not novel. *Appleton on Evidence* (1860) after posing the question whether a witness should be compelled to answer a question tending to degrade him states at *p.* 253 : "The answer may disgrace, but the truth of the matter may be assumed. The truth then will disgrace him. Why, then, should he not be disgraced? It is the consequence of his own act and his feelings should not be regarded in preference to the rights of the party inquiring. Without character he should not be permitted to stand before the jury as if he had it."

Since respondent could not have been punished criminally as a result of her testimony and since she was not privileged to refuse to answer on the ground that her answers might tend to disgrace her, it follows that her refusal was without justification. The order of the Superior Court, Law Division, is reversed and the cause is remanded to that court for further proceedings in accordance with this opinion.

*For reversal*—Chief Justice VANDERBILT, and Justices CASE, BURLING and ACKERSON—4.

*For affirmance*—Justices HEHER, OLIPHANT and WACHEN-FELD—3.