223 N.J. Super. 122 (1988)
538 A.2d 388
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JAMES JOHNSON, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted January 11, 1988.
Decided February 22, 1988.
*125 Before Judges PETRELLA, BAIME and ASHBEY.
Alfred Slocum, Public Defender, attorney for appellant (William E. Norris, designated counsel and on the brief).
W. Cary Edwards, Attorney General, attorney for respondent (Lisa Sarnoff Gochman, Deputy Attorney General, of counsel and on the brief).
The opinion of the court was delivered by BAIME, J.A.D.
The Essex County grand jury returned a multi-count indictment charging defendant with second degree aggravated assault (N.J.S.A. 2C:12-1b(1)), possession of a sawed-off shotgun (N.J.S.A. 2C:39-3b) and possession of a firearm for an unlawful purpose (N.J.S.A. 2C:39-4a). Defendant entered pleas of not guilty with respect to all charges and proceeded to trial. Following the conclusion of the State's case, the trial judge granted a judgment of acquittal on the count charging second degree aggravated assault, but found sufficient evidence to support submission of the reduced charge of fourth degree aggravated assault (N.J.S.A. 2C:12-1b(3)) to the jury. The judge also granted a judgment of acquittal on the count charging defendant with possession of a firearm for an unlawful purpose. The jury ultimately returned a verdict, finding defendant guilty of fourth degree aggravated assault and possession of a sawed-off shotgun. At sentencing, the judge imposed a custodial term of 18 months without parole eligibility on the aggravated assault *126 conviction.[1]See N.J.S.A. 2C:43-6c. Defendant was sentenced to a concurrent custodial term of 18 months on the conviction for possession of a sawed-off shotgun.[2] In addition, the judge assessed penalties totaling $125 payable to the Violent Crimes Compensation Board.
On appeal, defendant asserts that: (1) the trial judge mistakenly exercised his discretion by needlessly and improperly advising a defense witness of potential criminal charges that could be made against him and by apprising him of his privilege against self-incrimination, thereby encouraging him to refuse to testify, (2) the State's evidence was insufficient to support a charge of possession of a sawed-off shotgun and the question should not have been submitted to the jury, (3) the jury instructions concerning aggravated assault were materially deficient and (4) the judge should have instructed the jury on the principles of self-defense and imperfect self-defense both with respect to aggravated assault and possession of a sawed-off shotgun. Although we find no merit in defendant's other arguments, R. 2:11-3(e)(2), we conclude that the trial judge was ill-advised in apprising a defense witness he was in imminent peril of incriminating himself and advising him of his constitutional right not to respond to defense counsel's questions. We deem this error harmless beyond a reasonable doubt, however, and thus affirm defendant's convictions.
The incident giving rise to this prosecution grew out of an altercation between defendant and Jasper Murray. The fight began in the second-floor apartment of Theresa Jackson and later moved outside to the street in front of the house. The commotion was witnessed by several individuals, some of whom *127 apparently participated in varying degrees. According to the State's witnesses whose observations were limited to the protagonists' confrontation in the street, Murray carried a baseball bat and defendant was armed with a sawed-off shotgun. Albert Jackson testified that he attempted to stop Murray, who was wildly swinging the bat in the direction of defendant's head. Jackson noticed that defendant was cradling a shotgun pointed slightly to the side of Murray, when he heard a shot. Jackson, who was highly inebriated at the time of the incident, did not actually observe the antagonists because he was attempting to avoid being struck by the bat. In any event, Del Jackson, the 11 year-old brother of Albert, was wounded in the thigh.
The justification for the shooting offered at trial was that of self-defense and misadventure. Theresa Jackson testified that, after the initial fracas in her apartment, defendant was accosted by Murray in the street. According to her testimony, Murray, who was armed with a bat, repeatedly struck the windshield of defendant's automobile. He then began pursuing defendant, who, the witness said, did not have a weapon.
Defendant elected to testify in his own behalf. According to his account, Murray was lunging at him with the bat when someone in the crowd that had gathered handed him what "felt like a club with a wooden handle." As defendant turned around, Murray's bat came in contact with his shoulder, thereby causing the gun to fire. Defendant testified that the incident occurred so rapidly that he was not initially aware of the fact that he had a shotgun in his hands.
In an attempt to bolster defendant's contention that the shooting occurred either in self-defense or by way of misadventure, the defense offered Ernest Jackson as a witness. He testified that he observed the fight between Murray, who was swinging a baseball bat, and defendant, who was unarmed. According to Jackson, someone in the crowd of bystanders began waving a gun, at which point he ran over and "snatched *128 it away from him." At this posture, the prosecutor interposed an objection and, during the course of the ensuing side-bar conference, stated that the witness was incriminating himself and should be apprised of his right not to testify. In response, defense counsel noted his understanding, apparently gleaned from his prior interview with Jackson, that the witness would testify that he gave the gun to defendant to assist him in defending himself against Murray's attack. The judge then instructed the jury to disregard Jackson's statement that he wrestled the gun from a bystander. At that point, the jury was excused and a voir dire hearing was conducted.
At the hearing out of the jury's presence, the judge advised Jackson that his testimony concerning possession of the gun and his giving the weapon to defendant could "inculpate" him in the crime. The judge went on to observe that the "State could have a right if [it] so wants to charge [the witness] with possession of [a] gun or conceivably aiding [another] under the law." Jackson was cautioned by the judge that he had "a right to consult an attorney" and "to decide in [his] own mind whether [he] want[ed] to take that risk." The judge said that "[t]he State [might] charge" the witness with an offense, and implied that Jackson could avoid that prospect by electing to invoke his privilege against self-incrimination. Again, the witness was warned that "what [he said could] be used against [him]" and that he "could be subject to [a] criminal complaint." The witness was then advised that he would be given a five minute recess to determine which course to choose, because he, the judge, did not want "someone getting on the witness stand and making a statement" that would place him "in the position [defendant]" was then in.
After the recess, the witness noted his intention to assert the Fifth Amendment privilege. Asserting that his testimony was critical to the defense, defendant's attorney requested that Jackson be given "use immunity." The judge responded that he lacked the power to take that course, but that the prosecutor could do so. In response, the prosecutor noted that he had no *129 intention of seeking immunity. The judge then directed defense counsel and the prosecutor not to question Jackson concerning the manner in which defendant obtained the shotgun.
In the presence of the jury, Jackson testified that defendant was unarmed immediately prior to the shooting. He further stated that the weapon first appeared when Murray advanced toward defendant in a menacing fashion. According to Jackson, the gun fired when Murray swung the bat and struck defendant on the shoulder.
We are convinced that the action of the trial judge in apprising the witness that he was potentially subject to criminal charges and advising him of his right to invoke the privilege against self-incrimination constituted a mistaken exercise of discretion and transgressed the principles enunciated by our Supreme Court in State v. Jamison, 64 N.J. 363 (1974). In Jamison, the defendant was charged with atrocious assault and battery, assault with an offensive instrument and possession of a dangerous knife. During a recess in the trial, another individual involved in the assault, Sylvester Roseboro, indicated that he intended to take the stand for the defense and testify that he, not the defendant, had stabbed the victim. Id. at 368. Roseboro, who had earlier been informed of his constitutional rights by both defense counsel and the prosecutor, was questioned by the trial judge out of the presence of the jury. The judge again apprised Roseboro of his privilege against self-incrimination and told him that he might be subject to a charge of false swearing if his prospective testimony deviated from a pretrial statement he had given. Despite those warnings, Roseboro stated that he wished to plead guilty to the offense. The judge then sua sponte appointed counsel to advise Roseboro who, after consulting with the attorney, decided to invoke his Fifth Amendment privilege. Roseboro's attorney was then permitted to assert the privilege on behalf of his client. Following the hearing, the State's request to preclude Roseboro from testifying was granted. Id. at 372.
*130 The Supreme Court reversed the defendant's conviction on several grounds. The Court determined that allowing the attorney for the witness to interpose objections to questions rather than requiring the witness himself to claim the privilege and to justify it under oath was incorrect. Id. at 378. More importantly for the purpose of this appeal, while acknowledging the authority of a judge to advise a witness as to his privilege "where the witness is being brought into court involuntarily, as under subpoena," the Court nevertheless found that the trial judge had abused his discretion. Id. at 377. Noting that Roseboro had voluntarily come forward to testify, the Court observed that the steps taken by the trial judge to protect his rights were "in the context of an incipient criminal trial wherein the first concern of the court should have been the free flow of evidence for the enlightenment of the jury...." Id. at 376. The Court stated that "[i]n these circumstances the wise judicial course would have been, and ordinarily will be, to leave the matter of suspicion of criminality attendant upon the actions of the prospective witness to the prosecutor, for such attention at the conclusion of the case as he might deem warranted." Ibid. The trial judge was said to have mistakenly exercised his discretion because "there should have been weighed in the balance the more immediate interests of the defendant on trial and those of the general public to the fullest disclosure of the relevant evidence before the trial jury before any solicitude for protection of the volunteering witness." Id. at 377.
We recognize that the circumstances in Jamison were far more egregious than those present here. So too, we acknowledge that it is generally within a trial judge's discretion to apprise a witness, who has been subpoenaed to appear, of his privilege against self-incrimination.[3]Cf. Van Horn v. City of *131 Trenton, 80 N.J. 528, 535-536 (1979); State v. Vinegra, 73 N.J. 484, 488-489 (1977); State v. Williams, 59 N.J. 493, 503 (1971); State v. DeCola, 33 N.J. 335, 342 (1960); State v. Fary, 19 N.J. 431, 436 (1955). This much conceded, we are convinced that such authority should be exercised sparingly and with great caution, particularly where, as here, the prospective witness is not in imminent peril of being charged with a criminal offense, and assertion of the privilege will have the effect of suppressing evidence.
The issue must be considered within the context of the competing constitutional and social values involved. The privilege against self-incrimination, of ancient origin, is precious to a free society because it serves as a bulwark against high-handed and arrogant inquisitional practices. State v. Fary, supra, 19 N.J. at 434. The privilege "has survived centuries of hot controversy periodically rekindled when there is popular impatience that its protection sometimes allows the guilty to escape." Ibid. In that respect, it has been said that the price of occasional failures of justice under its protection is fairly compensated by the more enduring and broader interest of the general public security. Id. at 434-435. While not expressly set forth in our Constitution, the privilege is deeply rooted in New Jersey jurisprudence and has been firmly established in the law since our beginnings as a state. See, e.g., In re Pillo, 11 N.J. 8 (1952); In re Vince, 2 N.J. 443 (1949); State v. Miller, 71 N.J.L. 527 (E. & A. 1905); State v. Zdanowicz, 69 N.J.L. 619 (E. & A. 1903); Fries v. Brugler, 12 N.J.L. 79 (Sup.Ct. 1830).
As we have suggested, however, the privilege is not without cost. "Since the privilege results in the exclusion of evidence it runs counter to the widely held view `that the fullest disclosure of the facts will best lead to the truth and ultimately to the *132 triumph of justice.'" In re Richardson, 31 N.J. 391, 396 (1960), quoting In re Selser, 15 N.J. 393, 405 (1954). To the extent that the privilege suppresses evidence and thereby hinders the jury in its fact-finding role, we point out that a deliberately false judgment debases the judicial process, and no less so because the exclusion of evidence leads to a conviction rather than an acquittal. In either case, justice is denied because the truth has been suppressed. To justify so serious an insult to the judicial process, some compensating gain should be incontestable. Cf. State v. Bisaccia, 58 N.J. 586, 589 (1971).[4]
It is thus a fallacy to regard the right of a witness to remain mute when a potentially incriminating fact is the subject of inquiry as a fixed barrier to the search of the judicial process for the truth. As aptly observed in State v. Fary, supra, "[t]he barrier is up as to any question only when the witness himself chooses to put it up...." 19 N.J. at 435. Against that backdrop, we point out that the Fifth Amendment does not say a person cannot elect to forego exercising his privilege to remain silent. Rather, it says no more than an individual shall not be "compelled" to speak. While the court, and not the witness, is the ultimate arbiter whether assertion of the privilege is constitutionally permitted, it is the witness who must claim the privilege, and if he answers the question without asserting Fifth Amendment protection he irrevocably waives it. State v. Toscano, 13 N.J. 418, 423 (1953). See also State v. Marchese, 14 N.J. 16, 23 (1953).
It therefore follows as a logical corollary to the personal quality of the privilege that "there is no general requirement *133 calling for a warning to the witness, before the question is put, of his option to refuse to answer...." State v. Fary, supra, 19 N.J. at 435. Where, as here, a witness appears voluntarily, thereby signaling his intention to testify freely, and the hazard of incrimination is remote, sound public policy considerations, if not the defendant's Sixth Amendment right to compulsory process[5], militate against advising him of his right to remain mute and the dire consequences that could follow in the event he opts to waive his privilege. In that situation, we deem the protection accorded the witness to achieve the basic policy against self-condemnation to be outweighed by the interests of the litigants who would otherwise be denied the benefit of his testimony. See State v. DeCola, supra, 33 N.J. at 341; State v. Jennings, 126 N.J. Super. 70, 75 (App.Div. 1972), certif. den. 60 N.J. 512 (1972).
Here, there is nothing in the record to suggest that Jackson did not appear voluntarily without subpoena. Although perhaps his prospective testimony could have furnished "a link in [a] chain of evidence" needed to prosecute him, In re Ippolito, 75 N.J. 435, 440-441 (1978); see also Hoffman v. United States, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118, 1124 (1951); In re Pillo, supra, 11 N.J. at 19, that danger can fairly be characterized as extremely remote, unrealistic and highly speculative. After all, according to Jackson's account, his conduct was necessitated by the desire to protect defendant *134 from imminent attack. See N.J.S.A. 2C:3-5. See also State v. Fair, 45 N.J. 77, 92-93 (1965); State v. Holmes, 208 N.J. Super. 480, 490-491 (App.Div. 1986); State v. Moore, 178 N.J. Super. 417, 425-426 (App.Div. 1981), certif. den. 87 N.J. 406 (1981). The prosecutor had no standing to object to Jackson's testimony on the basis of the witness's privilege against self-incrimination. Cf. State v. Marchese, supra, 14 N.J. at 23. Assuming that his motivation in interposing an objection and alerting the judge to that prospect was solicitude for the witness[6], he had the right to seek immunity and thus could have avoided suppression of Jackson's testimony.
Under these circumstances, we perceive error in the course chosen by the trial judge. While we do not in any sense doubt his general good faith in seeking to protect the witness, we find that he mistakenly exercised his discretion.[7]
We have thoroughly reviewed the record in our effort to determine whether the judge's error requires a reversal. Because of the peripheral involvement of defendant's Sixth *135 Amendment right to compulsory process, we have considered the question within the context of the harmless error standard adopted by the United States Supreme Court in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), reh'g den. 386 U.S. 987, 87 S.Ct. 1283, 18 L.Ed.2d 241 (1967). Under Chapman, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." 386 U.S. at 24, 87 S.Ct. at 828, 17 L.Ed.2d at 710-711. In applying that standard, we must determine whether there was "some degree of possibility that [the error] led to an unjust verdict." State v. Macon, 57 N.J. 325, 335 (1971). See also State v. Merola, 214 N.J. Super. 108, 120-122 (App.Div. 1986), certif. den. 107 N.J. 91 (1987); State v. Downey, 206 N.J. Super. 382, 394 (App.Div. 1986).
Against that backdrop, we are convinced that the error complained of did not contribute to a verdict the jury would otherwise not have reached had Jackson not asserted the privilege against self-incrimination. We emphasize that Jackson's testimony, as given before the jury, substantially corroborated defendant's account and the version given by the other defense witnesses as to the manner in which the incident occurred. As we noted in our recital of the facts, Jackson testified that defendant was unarmed prior to Murray's attack. According to the witness, the gun first appeared in defendant's hands him when Murray approached him in a menacing manner. The witness testified that defendant accidentally fired the weapon when Murray struck his shoulder with the bat. The witness testified unequivocally that defendant acted in self-defense and that the shooting was purely accidental.
We stress that Jackson invoked the privilege only with respect to a limited subject, his identity as the person who gave the weapon to defendant. This testimony was not crucial to the defense. In short, Jackson testified fully as to the accidental nature of the shooting and defendant's need to use force to protect himself against Murray's assault. Under these circumstances, *136 we are entirely satisfied that the judge's error was harmless beyond a reasonable doubt.
As we noted previously, the judge erroneously sentenced defendant to a custodial term of 18 months on the conviction for possession of a sawed-off shotgun. Under N.J.S.A. 2C:39-3b, this offense constitutes a third-degree crime with a sentencing range of between three and five years. The sentence imposed was thus illegal. Rather than remanding the matter for resentencing on this count, we will exercise our original jurisdiction pursuant to R. 2:10-5 and suspend imposition of sentence under N.J.S.A. 2C:43-2b. We note that neither party has raised the problem, and defendant has fully served his custodial sentence on the aggravated assault conviction. Defendant's record of prior delinquency is minimal and, in light of these circumstances, it would be grossly unjust to impose a custodial sentence or require probationary supervision.
So modified, the judgment of convictions is affirmed.
NOTES
[1] We note that the parole ineligibility period is not set forth in the judgment of conviction.
[2] Possession of a sawed-off shotgun is a third degree offense, having a sentencing range of between three and five years. The sentence imposed was thus illegal.
[3] We note that this principle has generally been cited within the context of the grand jury setting. In a criminal trial, however, different considerations are applicable. Specifically, the accused faces the possibility of the loss of his liberty, and in the context of a murder prosecution the loss of his life. Obviously, the paramount interest, in the context of a criminal trial, is the free flow of relevant information. Weighed against that interest, the prospect that a witness may ultimately be charged with an offense by reason of what he says on the stand pales in significance.
[4] It is no answer to say that, without the awareness of possible incrimination and subsequent charges against him, a witness is encouraged to lie with impunity. The principle of full disclosure is not weakened by the obvious consideration that witnesses lie as well as tell the truth. We do not myopically assume the veracity of all witnesses. Rather, our belief is that in the long run, given all available information, the fact finder will generally arrive at the truth. State v. Jamison, supra, 64 N.J. at 376.
[5] In Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), the United States Supreme Court found two state statutes which prohibited co-indictees from testifying for one another, although they were free to testify for the state, to be violative of the Sixth Amendment. The Court held:

The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present ... the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law. [388 U.S. at 19, 87 S.Ct. at 1923, 18 L.Ed.2d at 1023].
[6] In State v. Fort, 101 N.J. 123 (1985) the Court held that a requirement by the prosecutor that co-defendants, as part of their plea agreement, not testify for defendants contravened defendants' constitutional rights to due process and to present witnesses in their favor. In explaining its holding the Court emphasized its belief that "the trial, although inevitably an adversarial proceeding, is above all else a search for the truth. That quest is better served when the State does not suppress the truth by sealing the lips of witnesses." 101 N.J. at 131.
[7] In Webb v. Texas, 409 U.S. 95, 98, 93 S.Ct. 351, 353, 34 L.Ed.2d 330, 333 (1972) the Court reversed a state conviction on the basis that the trial judge had used such "unnecessarily strong terms" in his warning to a prospective defense witness about perjury that he "effectively drove the witness off the stand, and thus deprived the petitioner of due process of law under the Fourteenth Amendment."

Although we do not go so far as to suggest that the trial judge's actions in this case "drove the witness off the stand," we are of the view that he needlessly encouraged Mr. Jackson to invoke his Fifth Amendment privilege. Again, we emphasize that, beyond informing Jackson of his privilege, the judge twice warned him that the State could charge him with an offense. Implicit in the warning was the suggestion that invocation of the privilege against self-incrimination would negate such a consequence.