237 N.J. Super. 585 (1990)
568 A.2d 583
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
MARK VASSOS, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted October 30, 1989.
Decided January 16, 1990.
*586 Before Judges J.H. COLEMAN, MUIR, Jr. and SKILLMAN.
Alfred A. Slocum, Public Defender, attorney for appellant (Travis L. Francis, Designated Counsel, on the brief).
Herbert H. Tate, Jr., Essex County Prosecutor, attorney for respondent (Virginia M. Lincoln, Assistant Prosecutor, of counsel and on the brief).
The opinion of the court was delivered by SKILLMAN, J.A.D.
Defendant was indicted together with James Robert Hinton, Dale Mullener and Guy Walsifer for conspiracy to commit robbery, in violation of N.J.S.A. 2C:5-2; armed robbery, in violation of N.J.S.A. 2C:15-1; burglary while armed, in violation of N.J.S.A. 2C:18-2; criminal restraint, in violation of N.J.S.A. 2C:13-2; receiving stolen property, in violation of N.J.S.A. 2C:20-7; possession of a handgun without a permit, in violation of N.J.S.A. 2C:39-5b, possession of a rifle without first obtaining a purchaser identification card, in violation of N.J.S.A. 2C:39-5c(1), and possession of a handgun with the purpose to use it unlawfully against the person of another, in violation of N.J.S.A. 2C:39-4a. A jury acquitted defendant of robbery but convicted him of the other charges.
The court granted the State's motion to sentence defendant as a persistent offender pursuant to N.J.S.A. 2C:44-3a and N.J.S.A. 2C:43-7a. At the original sentencing, defendant was sentenced to a 30 year term of imprisonment, with 15 years of parole ineligibility, for conspiracy to commit robbery, concurrent 15 year terms, with 7 1/2 years of parole ineligibility, for burglary, possession of a handgun without a permit and possession of a weapon for an unlawful purpose, and concurrent 7 year terms, with 3 1/2 years of parole ineligibility, on the remaining convictions. On its own motion, the court resentenced defendant to a 15 year term, with 7 1/2 years of parole ineligibility, *587 for conspiracy to commit robbery, and to a 7 year term, with a 3 1/2 year parole ineligibility period, for possession of a handgun without a permit, because it had been mistaken as to the extended term sentencing ranges for these offenses at the time of original sentencing.
On appeal, the Public Defender makes the following arguments on behalf of defendant:
I. THE TRIAL COURT COMMITTED REVERSIBLE ERROR AND DENIED THE DEFENDANT HIS SIXTH AND FOURTEENTH AMENDMENT RIGHTS TO DUE PROCESS AND A SPEEDY TRIAL BY DENYING THE DEFENDANT'S MOTION TO DISMISS THE INDICTMENT.
II. THE TRIAL COURT COMMITTED PLAIN ERROR BY THREATENING THE DEFENDANT'S EXCULPATING WITNESS WALSIFER WHICH RESULTED IN A MANIFEST DENIAL OF JUSTICE.
III. THE COURT COMMITTED REVERSIBLE ERROR BY ALLOWING THE PROSECUTOR TO EXCEED THE BOUNDS OF PROPER CROSS-EXAMINATION OF THE ALIBI WITNESS WHICH RESULTED IN A MANIFEST DENIAL OF JUSTICE.
IV. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY ADMITTING INTO EVIDENCE THE ACTUAL ALIBI NOTICE AND COMMITTED PLAIN ERROR BY ALLOWING THE PROSECUTOR TO MAKE SUMMATION ARGUMENT BASED ON SAID NOTICE WHICH RESULTED IN A MANIFEST DENIAL OF JUSTICE.
V. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY FAILING TO CHARGE THE JURY THAT VALUE WAS AN ELEMENT OF THEFT.
VI. THE TRIAL COURT COMMITTED PLAIN ERROR BY FAILING TO DISMISS THE THEFT COUNT BASED ON THE STATE'S FAILURE TO ESTABLISH VALUE.
VII. THE SENTENCE IMPOSED WAS MANIFESTLY EXCESSIVE BASED ON THE COURT'S APPLICATION OF N.J.S.A. 2C:44-3.
VIII. THE SENTENCE IMPOSED WAS MANIFESTLY EXCESSIVE BASED ON THE TRIAL COURT'S FAILURE TO MERGE COUNT I CONSPIRACY PURSUANT TO N.J.S.A. 2C:1-8.
Defendant has filed a supplemental pro se brief which makes the following additional argument:
DEFENDANT WAS DENIED REASONABLE COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION.
We affirm the denial of defendant's motion to dismiss the indictment on speedy trial grounds, substantially for the reasons expressed in the trial court's oral opinion of September 9, 1987. However, we reverse the judgment of conviction and *588 remand the matter for a new trial, because the trial court's interruption of the testimony of defendant's key witness to warn him of the possible penal consequences of his testimony and the subsequent refusal of the witness to testify further denied defendant a fair trial. Our reversal of defendant's conviction on this ground makes it unnecessary to address defendant's other arguments relating to alleged trial errors which are unlikely to recur at a new trial. However, we note that the trial court sentenced defendant to extended terms for every offense of which he was convicted. This sentence violated N.J.S.A. 2C:44-5a(2), which provides that "[w]hen multiple sentences of imprisonment are imposed on a defendant for more than one offense ... such multiple sentences shall run concurrently or consecutively as the court determines at the time of sentence, except that ... [n]ot more than one sentence for an extended term shall be imposed." (Emphasis added). Therefore, if defendant is again convicted of more than one offense upon his retrial, he should not be sentenced to more than one extended term.
Defendant's convictions arose out of a burglary of a K-Mart store in Belleville and a robbery of a maintenance man working in the store. The victim was not able to identify any of his assailants. The only evidence presented by the State to link defendant to the crime was the testimony of James Hinton, who pled guilty to the crime pursuant to a plea bargain with the State. Hinton testified that defendant was one of his confederates.
The key witness for the defendant was Guy Walsifer, who also pled guilty to the crime. After admitting his own involvement, Walsifer proceeded to give the following testimony exculpating defendant:
Q. During the time that this offense was committed, was Mr. Vassos present? Did he assist in committing the offense at K-Mart in Belleville?
A. No.
Q. You were there?
A. Yes.

*589 Q. Who else was with you?
A. Dale.
Q. Dale what? Last name?
A. Mullener.
Q. Who else?
A. James Hinton and another guy, Mark, that I knew through Dale. I didn't know him that good. And that's who was there.
Q. In other words, there is another person named Mark?
A. Excuse me?
Q. There is another person that you know as Mark?
A. Yes.
At that point, the prosecutor asked to be allowed to approach sidebar and the following colloquy occurred:
[Prosecutor]: Your Honor, at this time, before Mr. Agee continues, I think you may have to advise the defendant of his constitutional rights, because at his prior plea when he gave his plea agreement, he implicated all co-defendants, Mr. Vassos included. He also gave statements to the Belleville Police Department implicating Mr. Vassos, as well as the Essex County Probation Department, who completed his presentence investigation report.
So if we continue in this vein, I think he should be advised of his rights, because he may be subject to perjury.
[Defense counsel]: You have a right to impeach his credibility.
[Prosecutor]: That's not what I'm talking about. I think he should be advised of his constitutional rights at this point.
After the court asked defense counsel whether he had interviewed Walsifer before he took the stand and was aware that his testimony would be inconsistent with his prior statements, the following colloquy occurred between the court and Walsifer:
THE COURT: Mr. Walsifer, by virtue of the responses that you have given to the questions you have been asked so far, it is necessary for me to advise you of your constitutional rights before you proceed in this matter.
It has been brought to my attention that the testimony which you have given thus far is inconsistent with other testimony you have given under oath.
THE WITNESS: No, I 
THE COURT: Namely, on the following occasions: At the time of your plea before the Court, statements that might have been made to the Probation Office during preparation of your presentence investigation, the statements that you have given thus far may also be inconsistent with a tape recorded statement that was taken from you by the Belleville Police.
You should be aware that you are under oath, and anything you say at this time under oath can be used against you, and specifically with regard to the prosecution of the offense of perjury.

*590 You should be aware that your testimony will subject you to cross-examination, at which time you may be confronted with those prior inconsistent statements and you may face prosecution as a result of these statements that you have given under oath.
Do you understand that?
THE WITNESS: Yes, That recorded statement I made in the police station, I was threatened, I was beaten up. I was high on drugs.
THE COURT: Mr. Walsifer, you will be questioned concerning the background of those things, I'm sure. At this point, I'm just trying to make you understand that anything you say here under oath, you are not covered by any privilege, you could be prosecuted for perjury as a result of your testimony here.
You will be given an opportunity, I'm sure, through the examination of these attorneys, to explain those things that you wish to explain. But you could be subjecting yourself to perjury and to penalties. Do you understand that?
THE WITNESS: Yes.
THE COURT: Including incarceration. Do you understand that?
THE WITNESS: Yes. then  I remember little or next to nothing from the whole situation back then, even with the K-Mart job in hand. I would rather not even say anything, then, about the whole thing, because I don't remember this very much. I don't remember hardly nothing. I have dyslexia. I can't remember things from last week, never mind three years ago.
And I remember getting beat up in the police station. They wanted me to say Mark was there. I told them I couldn't read or write due to my dyslexia 
THE COURT: Is it your comment to the Court, before you go any further, that you are declining to testify in this proceeding as a result of the warnings I have given you?
THE WITNESS: Yes.
THE COURT: Mr. Agee?
[Defense counsel]: Your Honor, this does create somewhat of a problem for the defense.
THE COURT: Remove the witness, please.
After further discussion with counsel, the court directed that Walsifer be given an opportunity to confer with his own counsel. Walsifer then conferred with a member of the Public Defender's office, who advised the court that his client would exercise his purported Fifth Amendment right not to give further testimony. Subsequently, the court advised the jury to disregard Walsifer's testimony exculpating defendant.
We conclude that the trial court's interruption of Walsifer's trial testimony to warn him that it could subject him to prosecution for perjury and the subsequent striking of Walsifer's *591 testimony when he refused to continue testifying violated defendant's due process right to a fair trial.
In State v. Jamison, 64 N.J. 363 (1974), the trial court was advised that a proposed defense witness would testify that he and not defendant had committed the atrocious assault with which defendant was charged. Although defense counsel told the court that the witness had been advised of his rights, the court questioned the witness at length regarding his awareness that his proposed testimony could be used against him in subsequent proceedings and the length of the sentence he could receive if he were found guilty. After conferring with a public defender assigned to advise him, the witness denied any involvement in the crime and indicated that he would claim his privilege against self-incrimination if called to testify. The Supreme Court concluded that the trial court's statements to the defense witness, leading to the retraction of his proposed exculpatory testimony, constituted a denial of defendant's due process right to a fair trial. The Court stated:
[T]he wise judicial course would have been, and ordinarily will be, to leave the matter of suspicion of criminality attendant upon the actions of the prospective witness to the prosecutor, for such attention at the conclusion of the case as he might deem warranted.
If the pretrial interlude had not occurred and the defense attorney had simply called Roseboro for the defense pursuant to its notice to the State that he would be a witness, Roseboro would presumably have testified to the same effect as he did at the pretrial session, exculpating defendant but undoubtedly facing confrontation with his contrary original statement to the police. The jury would thus have had all the available evidence before it for resolution of its credibility. [Id. at 376-377].
In State v. Johnson, 223 N.J. Super. 122 (App.Div. 1988), defendant was accused of aggravated assault and several weapons offenses as a result of a shooting. Defendant presented a witness who started to testify that the weapon defendant ultimately used had been brandished by a third party during a street confrontation but that the witness had run over to the other party and snatched the weapon away from him. At that point, as in the present case, the prosecutor objected that the witness was incriminating himself and should be apprised of his *592 right not to testify. Subsequently, the court advised the witness that his possession and transfer of the gun to defendant could inculpate him in the crime and subject him to prosecution. The court also implied that the witness could avoid this danger by invoking his privilege against self-incrimination. After a short recess, the witness asserted his Fifth Amendment privilege. We held that "the action of the trial judge in apprising the witness that he was potentially subject to criminal charges and advising him of his right to invoke the privilege against self-incrimination constituted a mistaken exercise of discretion and transgressed the principles enunciated by our Supreme Court in State v. Jamison, 64 N.J. 363 (1974)." 223 N.J. Super. at 129. We also noted that "[t]he prosecutor had no standing to object to Johnson's testimony on the basis of the witness's privilege against self-incrimination." 223 N.J. Super. at 134. Beyond that, we held that the trial judge should not have interrupted the witness's testimony exculpating defendant by warning him of the danger of his own possible self-incrimination:
Where, as here, a witness appears voluntarily, thereby signaling his intention to testify freely, and the hazard of incrimination is remote, sound public policy considerations, if not the defendant's Sixth Amendment right to compulsory process, militate against advising him of his right to remain mute and the dire consequences that could follow in the event he opts to waive his privilege. In that situation, we deem the protection accorded the witness to achieve the basic policy against self-condemnation to be outweighed by the interests of the litigants who would otherwise be denied the benefit of his testimony. [Id. at 133 (citations omitted)].
We conclude that the principles expressed in Johnson and Jamison require the reversal of defendant's conviction. As in those cases, Walsifer appeared voluntarily as a defense witness but then was discouraged from giving testimony favorable to the defendant by the court's warnings regarding the possible penal consequences of his testimony. In fact, the court's error in interrupting Walsifer's testimony is even clearer here than it was in Johnson and Jamison, because the trial court had no reason to advise the witness of his privilege against self-incrimination.
*593 There is no indication that either the prosecutor or the court believed that Walsifer's prior statements inculpating defendant had been perjured. Rather, they believed that Walsifer had committed perjury in his trial testimony exculpating defendant. However, the giving of testimony which the prosecutor or the court considers to be perjured is not a basis for warning a witness about his privilege against self-incrimination. "[T]he privilege [against self-incrimination] may not be allowed because of a present purpose to falsify." State v. DeCola, 33 N.J. 335, 351 (1960); see also State v. Williams, 59 N.J. 493, 500 (1971). ("[T]he Fifth Amendment protects a witness only with respect to disclosure of a past offense and does not entitle the witness to commit perjury in the testimony given under order to testify."). Therefore, the trial court erred in suggesting to Walsifer that his present intention to perjure himself provided the occasion for invoking his privilege against self-incrimination and refusing to testify at all.[1]
The trial court's warnings to Walsifer were similar, though not as extreme, as those in Webb v. Texas, 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972), in which the trial judge admonished a witness that he did not have to testify, that anything he said could and would be used against him, and that if he lied under *594 oath, the Court would personally see that he was indicted for perjury. Id. at 95-96, 93 S.Ct. at 352-53. When defense counsel objected to these comments and indicated that he was nonetheless going to ask the witness to take the stand, the judge stated: "Let him decline to testify." Id. at 96, 93 S.Ct. at 353. The witness then refused to testify and was excused by the court. Ibid. The Court held that the trial judge's warnings could have exerted sufficient duress on the witness to preclude him from making a free and voluntary choice whether to testify. Id. at 98, 93 S.Ct. at 353. Consequently, the Court concluded that defendant's due process rights under the Fourteenth Amendment had been violated. The Court also quoted the observation in United States v. Winter, 348 F.2d 204, 210 (2nd Cir.1965), cert. den. 382 U.S. 955, 86 S.Ct. 429, 15 L.Ed.2d 360 (1965) that:
Once a witness swears to give truthful answers, there is no requirement to "warn him not to commit perjury or, conversely to direct him to tell the truth." It would render the sanctity of the oath quite meaningless to require admonition to adhere to it. [409 U.S. at 97, 93 S.Ct. at 353].
See also Marshall v. State, 291 Md. 205, 434 A.2d 555, 558 (Md. App. 1981) ("[W]hen the trial court takes it upon itself to warn a witness ... about the consequences of failing to testify truthfully, ... it is swimming in treacherous waters.").
We recognize that it may be appropriate in some circumstances to warn a witness about the dangers of perjury in order to encourage him to speak truthfully. See, e.g., United States v. Nunn, 525 F.2d 958, 960 (5th Cir.1976); People v. Davis, 88 Ill. App.3d 265, 43 Ill.Dec. 533, 536-537, 410 N.E.2d 533, 536-537 (App.Ct. 1980). However, the thrust of the trial court's comments in this case was not to encourage Walsifer to tell the truth but rather to advise him of his "constitutional right" not to testify at all. Therefore, as in Webb, it was almost inevitable that the court's comments would cause the witness to invoke his purported privilege not to testify, thereby depriving defendant of evidence which could have led to his acquittal.
*595 Furthermore, Walsifer waived any Fifth Amendment privilege he may have had to decline to answer questions regarding defendant's involvement in the crime. As we noted in State v. Bishop, 187 N.J. Super. 187, 192 (App.Div. 1982):
It is perfectly clear that once privileged material is disclosed, the privilege of non-disclosure is waived.... It is equally clear that the waiver is irrevocable once a witness answers a question without claiming the privilege.
Walsifer had clearly and unequivocally testified that defendant was not involved in the crime before the prosecutor raised the objection which led the court to advise Walsifer of his "constitutional rights." Walsifer had also already identified the fourth perpetrator of the crime as another person named Mark. In fact, the direct examination of Walsifer appears to have been nearly completed when the trial court issued its warnings to him. Consequently, even assuming that Walsifer could have invoked his privilege against self-incrimination to avoid answering questions regarding defendant's involvement in the crime, he had already waived that privilege before the trial court advised him of its existence.
We also reject the State's argument that any error of the trial court in interrupting Walsifer's testimony was harmless. Walsifer's invocation of his privilege against self-incrimination and the subsequent striking of his prior testimony was clearly prejudicial to the defendant. See State v. Fort, 101 N.J. 123, 131 (1985). The sole evidence linking defendant to the crime was the testimony of one admitted perpetrator. Consequently, it is quite possible that the testimony of another admitted perpetrator denying that defendant had been a participant would have created reasonable doubt in the minds of the jury regarding defendant's guilt.
Accordingly, the judgment of conviction is reversed and the matter is remanded for a new trial.
NOTES
[1] We note that a person who makes inconsistent statements under oath may be prosecuted for false swearing without the prosecutor proving which statement was false but only that one or the other was false and not believed by the defendant to be true. N.J.S.A. 2C:28-2(c). We further note that if Walsifer had invoked his privilege against self-incrimination at defendant's trial and the court had nonetheless ordered him to testify, his trial testimony could not have been used against him in a prosecution charging that his prior statements were perjured. State v. DeCola, 33 N.J. 335, 344-354 (1960); see also Evid.R. 38. On the other hand, his prior statements would be admissible to support a charge that his trial testimony was perjured. State v. DeCola, supra, 33 N.J. at 354. Although the trial court had no obligation to decide which of Walsifer's statements was true because it had no responsibility in either event to advise him of his privilege against self-incrimination, the fact that the court considered Walsifer's trial testimony to be perjured underscores the inappropriateness of warning him of the penal consequences of his testimony and suggesting that he could invoke his privilege against self-incrimination.